Filed 7/3/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| NORTH COAST RIVERS ALLIANCE et al., | F067383 |
| Plaintiffs and Appellants, | (Super. Ct. No. 12CECG00237) |
| v. | |
| WESTLANDS WATER DISTRICT et al., | **OPINION** |
| Defendants and Respondents; | |
| UNITED STATES BUREAU OF RECLAMATION, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Fresno County. James M. Petrucelli, Judge.

Law Offices of Stephan C. Volker, Stephan C. Volker, Alexis E. Krieg and Daniel P. Garrett-Steinman for Plaintiffs and Appellants.

Pioneer Law Group, Andrea A. Matarazzo, Jeffrey K. Dorso; Kronick, Moskovitz, Tiedemann & Girard, Thomas W. Birmingham and Harold Craig Manson for Defendants and Respondents.

No appearance for Real Party in Interest and Respondent United States Bureau of Reclamation.

-ooOoo-

In February 2012, Westlands Water District and its related distribution districts (together Water Districts or respondents)[1] entered into two-year, interim renewal contracts with the United States Bureau of Reclamation (the Bureau) relating to the Bureau's ongoing provision of Central Valley Project (CVP) water to Water Districts. The purpose of the interim renewal contracts was to continue the existing terms for water delivery in advance of the parties' anticipated execution of new, long-term (25-year) renewal contracts, which process was awaiting the Bureau's completion of environmental documentation necessary for the execution of such long-term agreements. When Water Districts approved the interim renewal contracts, they made specific findings that the renewals were exempt from the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[2] Accordingly, Water Districts did not undertake their own environmental review prior to such approvals. Thereafter, North Coast Rivers Alliance, Friends of the River, Save the American River Association, the California Sportfishing Protection Alliance and the Winnemem Wintu Tribe (collectively petitioners) filed a petition for writ of mandate in Fresno County Superior Court, contending that the interim renewal contracts were not exempt from CEQA and that Water Districts should have undertaken a full environmental review. The trial court disagreed and denied the petition for writ of mandate. Petitioners have appealed from the judgment of dismissal. Based on the record before us, we conclude that the matters contemplated in the interim renewal contracts were exempt from CEQA, including under

---

[1] The related districts were Westlands Water District Distribution District No. 1 (Westlands Distribution District No. 1) and Westlands Water District Distribution District No. 2 (Westlands Distribution District No. 2) (together the Distribution Districts).

[2] All further statutory references are to the Public Resources Code unless otherwise indicated.

2.

the statutory exemption for ongoing pre-CEQA projects (Guidelines,[3] § 15261) and the categorical exemption for the continued operation of existing facilities at the same level of use (Guidelines, § 15301). Therefore, we affirm the judgment below.

## FACTS AND PROCEDURAL HISTORY

The Contracting Parties

The subject agreements were entered into by the Bureau and Water Districts, each of which are public entities. The Bureau is the federal agency that operates the CVP, administers CVP water and enters into contracts to provide that water to contractors such as Water Districts (known as water service contracts). Water Districts are public entities established for the purpose of receiving CVP water and distributing that water to end-users (i.e., farmers) for beneficial use (i.e., irrigation to grow crops) on lands within Water Districts' boundaries. (See, e.g., Wat. Code, § 37800 et seq. [relating to Westlands Water District].)

Westlands Water District, by far the largest of respondent districts, serves over 600,000 acres of farmland on the west side of the San Joaquin Valley. Westlands Water District has had water service contracts in place with the Bureau since the 1960's and, through such contracts, has had a right to receive approximately 1 million acre-feet of CVP water per year, subject to water availability and other factors.[4] The other two respondents, Westlands Distribution District No. 1 and Westlands Distribution District No. 2, which were formed more recently (in 2000 and 2002 respectively), have acquired

---

[3] "Guidelines" refers to the administrative regulations implementing CEQA found in title 14, section 15000 et seq., of the California Code of Regulations, as authorized by Public Resources Code section 21083. The Secretary of the State Resources Agency is responsible for adopting guidelines and amendments thereto, based on recommendations from the Office of Planning and Research. (See § 21083, subds. (a), (e) & (f).)

[4] This number is a general approximation for background purposes. Subsequently herein, we will provide more specifics concerning the contracts and the particular acre-feet of water involved.

3.

additional CVP water rights by assignments from other water districts serving the area.[5] Westlands Distribution District No. 1 and Westlands Distribution District No. 2, as the holders of those assigned water rights, are now the contracting parties for purposes of entering into renewals thereof.

With respect to Water Districts' existing contractual rights to receive CVP water, the Bureau and Water Districts are willing to enter into long-term renewal contracts, but that prospect has been delayed by the Bureau's failure to complete the required environmental documentation. In the meantime, the parties have agreed to a series of interim renewal contracts in order to continue water deliveries on the same terms as before. The six 2-year, interim renewal contracts entered into by the parties in 2012 are the subject of the instant appeal.

The CVP

Because the water that is the subject of the contracts between Water Districts and the Bureau is diverted, stored and delivered through CVP facilities (and is generally referred to as CVP water), we now explain what the CVP is and how it operates so that the issues before us may be seen within their larger context. The history and scale of the CVP are well-chronicled in the case law. (See, e.g, *Westlands Water Dist. v. U.S.* (9th Cir. 2003) 337 F.3d 1092, 1095-1096 (*Westlands*).) In providing this general overview of the CVP, we shall draw upon the record below as well as on publicly known facts regarding the CVP that are reported in the case law.

The CVP is a federal reclamation project built within the major watersheds of the Sacramento and San Joaquin River systems and the Delta, providing water storage and distribution to the Central Valley of California. A recent federal opinion noted the

---

[5]     Such assignments were purchased to increase flexibility and overall water availability, which factors are critical to Water Districts and to the farmlands served by them—especially in low rainfall years.

4.

following legal and factual background: "Reclamation projects are indispensible features of agriculture in the Western United States. 'The Reclamation Act of 1902 set in motion a massive program to provide federal financing, construction, and operation of water storage and distribution projects to reclaim arid lands in many Western States.' [Citations.] … [¶] The Central Valley Project ('CVP') is 'a system of dams, reservoirs, levees, canals, pumping stations, hydropower plants, and other infrastructure [that] distributes water throughout California's vast Central Valley.' [Citation.] The CVP was originally 'taken over and executed' by the United States under the Reclamation Act and was reauthorized by the Rivers and Harbors Act of 1937, Pub. L. No. 75-392, 50 Stat. 844, 850 ('the CVP Act'). [Citation.]" (*San Luis Unit Food Producers v. U.S.* (9th Cir. 2013) 709 F.3d 798, 801 (*San Luis Unit*).) The Bureau is the agency within the United States Department of the Interior charged with administering the CVP. (*Westlands*, *supra*, 337 F.3d at p. 1096; *San Luis Unit*, *supra*, at p. 801.)

As built and operated, the CVP is "the nation's largest water reclamation project and California's largest water supplier." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1154, fn. omitted.) It operates 21 reservoirs, 11 power plants, and 500 miles of major canals and aqueducts. With total storage capacity of more than 12 million acre-feet, the CVP delivers approximately 7 million acre-feet of water annually to over 250 water contractors, primarily for agricultural use in the Central Valley. (*Ibid.*, fn. 1) The CVP "'supplies two hundred water districts, providing water for about thirty million people, irrigating California's most productive agricultural region and generating electricity at [numerous] power plants.'" (*San Luis & Delta-Mendota Water Authority v. U.S.* (9th Cir. 2012) 672 F.3d 676, 682 (*San Luis & Delta Mendota*), quoting *Westlands Water Dist. v. U.S. Dept. of Interior* (9th Cir. 2004) 376 F.3d 853, 861.) The Bureau operates the CVP

under water rights granted by the State Water Resources Control Board (SWRCB). (*In re Bay-Delta, etc., supra,* at p. 1154.)[6]

In 1960, Congress authorized the construction of the San Luis Unit "'as an integral part'" of the CVP (the San Luis Act; Pub.L. No. 86-488 (Jun. 3, 1960) 74 Stat. 156).[7] (*San Luis Unit*, *supra*, 709 F.3d at p. 802.) The San Luis Act states that the "'principal purpose'" of the Unit is to furnish water for irrigation. (*Ibid.*) The San Luis Unit of the CVP includes the San Luis Dam and the San Luis Reservoir, along with a system of canals, channels and pumping plants. The San Luis Reservoir was constructed on the west side of the San Joaquin Valley to store surplus water from the Sacramento-San Joaquin Delta and to provide water for irrigation and other purposes primarily in Merced, Fresno and Kings Counties. (*Westlands*, *supra*, 337 F.3d at p. 1096.)[8] A pumping station at the Delta's southern end draws varying amounts of water that is conveyed by canals to the San Luis Unit and Reservoir. (*Ibid.*)[9] Water from the San Luis Unit of the CVP is delivered to contractors (e.g., Water Districts), who then provide water to the end-users such as farmers on the west side of the Central Valley. (*Ibid.*; see also *San Luis Unit*, *supra*, at p. 802.) The interim renewal contracts at issue in the present case relate to the ongoing provision of water by the Bureau to Water Districts from the San Luis Unit of the CVP.

---

[6] Additionally, the CVP shares certain facilities with the California State Water Project. The two projects have been operated "in an increasingly coordinated manner." (*San Luis & Delta-Mendota*, *supra*, 672 F.3d at p. 683.)

[7] The San Luis Unit is also part of the State Water Project, and certain facilities of the Unit are jointly operated by the Bureau and the State of California.

[8] In addition to meeting irrigation needs, the San Luis Unit of the CVP provides water to several cities.

[9] More specifically, "[t]he Tracy Pumping Plant pumps water from the Sacramento-San Joaquin Delta into the Delta-Mendota Canal. The Delta-Mendota Canal, located south of the … Delta, channels water along the west side of the San Joaquin Valley for use in the San Luis Unit and Reservoir." (*Westlands*, *supra*, 337 F.3d at p. 1096.)

We note in passing that when the San Luis Unit was authorized by Congress in 1960, it was on the condition that adequate drainage from the area served by that Unit was to be provided. (*Firebaugh Canal Co. v. U.S.* (9th Cir. 2000) 203 F.3d 568, 570.) The reason for such a requirement was the common knowledge that "[i]rrigation and drainage are inherently linked" and "[a]ny water project that brings fresh water to an agricultural area must take the salty water remaining after crops have been irrigated away from the service area." (*Id*. at p. 571.) The statutory obligation to provide for such drainage was placed squarely on the United States Department of the Interior. (*Ibid*.; see also *Firebaugh Canal Water Dist. v. U.S.* (9th Cir. 2013) 712 F.3d 1296, 1298-1303.) That obligation remains unfulfilled.[10] One of the long-term consequences of lack of adequate irrigation drainage is a buildup of salt content in the soil and groundwater, which poses a particular problem in much of the agricultural acreage served by Water Districts, since those lands sit on a shallow bed of hard or impervious clay and the water has nowhere to move or drain. Hence, a drainage solution will eventually be needed in order to maintain future agricultural productivity in such areas.

The Bureau Operates the CVP Subject to Environmental Laws and Other Factors

In the original 1937 CVP Act, Congress prioritized the purposes of the CVP as "'first, for river regulation, improvement of navigation, and flood control; *second, for irrigation* and domestic uses; and, third, for power.'" (*San Luis Unit*, *supra*, 709 F.3d at p. 801, quoting the 1937 CVP Act, § 2.) In 1992, Congress passed the Central Valley Project Improvement Act (the CVPIA; Pub.L. No. 102-575 (Oct. 30, 1992) 106 Stat. 4706), which, among other things. amended the original CVP Act to reprioritize the objectives of the CVP. The CVPIA elevated the protection of fish and wildlife to one of

---

**10**　In recent years, efforts have been made by the Bureau to develop and implement a drainage plan, but Congressional inertia (as to funding) has apparently slowed progress. (*Firebaugh Canal Water Dist. v. U.S.*, *supra*, 712 F.3d at pp. 1299-1303.)

the main purposes of the CVP, alongside of irrigation and domestic uses, and it reserved 800,000 acre-feet of CVP water for environmental and wildlife protection purposes. (CVPIA, §§ 3406(a) & (b)(2), 3404(c); see also *In Re Bay-Delta etc.*, *supra*, 43 Cal.4th at p. 1154; *San Luis Unit*, *supra*, at pp. 801-802.)[11] The CVPIA also expressly required the Bureau to operate the CVP to "meet all obligations under state and federal law, including but not limited to the Federal Endangered Species Act, [title] 16 [of the United States Code section] 1531, et seq., and all decisions of the California [SWRCB] establishing conditions on applicable licenses and permits for the project." (CVPIA, § 3406(b).)[12]

As this regulatory overview confirms, the Bureau operates the CVP and allocates CVP water subject to a comprehensive scheme of environmental statutes and regulations, including the environmental requirements of the CVPIA, the federal Endangered Species Act of 1973, and various state and federal regulations of Delta water flow and water quality. (*San Luis & Delta-Mendota*, *supra*, 672 F.3d at pp. 682-683 [noting the Bureau's control of the CVP water is subject to "a plethora of federal statutes and

---

[11] One of the CVPIA's stated legislative goals was "[t]o achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agriculture, municipal and industrial and power contractors." (CVPIA, § 3402(f).) Whether the CVPIA reasonably balances competing demands, or instead tilts the scales too far to one direction, is a legislative policy decision that is beyond the purview of this court.

[12] The reference to SWRCB's decisions apparently relates to that agency's authority to protect the state's water resources and quality in connection with the issuance of water rights permits, which authority was outlined in *United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 106-126. The CVPIA expressly alludes to this 1986 opinion and to the SWRCB in regard to the regulation of water flow standards in the Delta. (CVPIA, § 3406(b)(1)(C) & (b)(7).) Under the Reclamation Act of 1902 (43 U.S.C. § 383), which is still in effect, the Bureau is required to comply with state law in acquiring water rights for the diversion and storage of water by the CVP. (*Westlands*, *supra*, 337 F.3d at p. 1101.)

8.

regulations governing" such matters as "the CVP yield," "water quality," and "the impact of releases on the environment and wildlife"]; *San Luis Unit*, *supra*, 709 F.3d at p. 802.)

Of course, another major factor in the Bureau's task of allocating water to contractors (such as Water Districts) is annual precipitation. The Bureau's water plan states: "[The Bureau] holds contracts with many water districts and municipalities which commit the agency to provide up to a maximum quantity of water in any particular year. Each year, [the Bureau] must determine, based on meteorological and hydrological conditions and other operational and institutional factors, how much water can actually be delivered to each district and municipality. This is called the allocation process. Allocations are usually expressed as a percentage of the maximum contract volumes of water prescribed in the contracts held between [the Bureau] and the various water districts, municipalities and other entities." (U.S. Dept. Interior, Bureau of Reclamation, Central Valley Project Water Plan (2011) p. 4; CVP Water Plan.) However, in addition to considering the amount of water available from rainfall, expected snowpack runoff from the Sierra and reservoir storage, the Bureau also takes into account its obligations under environmental laws, which often significantly impact its determination of the amount of CVP water available to contractors.[13]

Not infrequently, the Bureau must make its water allocation decisions during periods of drought. In its water service contracts with contractors, the Bureau includes standard provisions for the reduction of water quantities to contractors during a drought

---

[13]    As noted in the Bureau's CVP Water Plan: "[The Bureau] balances allocation of CVP water for agricultural, environmental, and municipal and industrial purposes. The complex task is driven by numerous factors, including hydrology, conditions as reported by [the California Department of Water Resources], storage in CVP reservoirs, input from other agencies and organizations, regulations, court decisions, biological opinions, environmental considerations, and operational limitations." (CVP Water Plan, *supra*, at p. 3.)

or water shortage.[14] (*San Luis Unit*, *supra*, 709 F.3d at p. 802; *Westlands*, *supra*, 337 F.3d at p. 1097.) Even in such dry years when contractors' allocations must be reduced due to inadequate rain and snow, the amount of water that the Bureau allocates to contractors is further limited by the constraints or mandates imposed on the Bureau by the CVPIA and other environmental laws. In practice, CVP water is made available to Water Districts only after the Bureau's obligations under environmental laws are satisfied and the rights of holders of senior water rights are met. (*San Luis Unit*, *supra*, at p. 802.)

The Water Service Contracts and the Interim Renewals Thereof

Water service contracts with the Bureau are the prescribed legal arrangement through which CVP water is provided to contractors. The purposes of water service contracts are to establish the rates and other terms for water delivery, to produce sufficient revenue to recover an appropriate share of the federal government's capital investment, and to repay the Bureau's annual operation and maintenance costs. (43 U.S.C. § 485h(e).) Water service contracts are the mechanisms used to recover each contractor's share of these costs as a condition for receiving CVP water. (*Ibid*.)

Here, the original water service contract between the Bureau and Westlands Water District was entered into in 1963,[15] and it remained in effect for a period of 40 years, commencing with the first delivery of water from the San Luis Unit to Westlands Water District. Under the 1963 water service contract, Westlands Water District was entitled to receive up to 1,008,000 acre-feet per year, with a reduction to 900,000 acre-feet per year after 1979. However, additional water had been provided by the Bureau under a 1968 supplemental contract and by allocation decisions thereafter. In 1986, a stipulated court

---

[14] Water Districts point out that low supplies of water do not affect all contractors evenly, since some have senior rights to CVP water. During water shortages, Water Districts' allocations are among those that the Bureau cuts first.

[15] At that point in time, the other respondent water districts did not yet exist.

judgment (known as the *Barcellos* judgment) recognized that Westlands Water District was entitled to 250,000 acre-feet of water each year *in addition to* the 900,000 acre-feet per year indicated above (for a total of 1.15 million acre-feet per year). The 40-year period of the parties' 1963 water service contract expired at the end of 2007. At that time, it was understood by both parties that the anticipated, long-term renewal of their water service contract would be for 1.15 million acre-feet of water. The 2012 interim renewal contract with Westlands Water District relates to this same 1.15 million acre-feet of water per year.

In 1992, long before the expiration of Westlands Water District's 1963 water service contract (as described above), the CVPIA was enacted into law. The CVPIA provided that the Bureau "shall," upon request, renew existing long-term water service contracts for a period of up to 25 years,[16] but only after the Bureau first completed preparation of a programmatic environmental impact statement (EIS) that examined the effects on the environment of implementing the CVPIA, including the effects on the environment of renewing the existing long-term water service contracts. (CVPIA, §§ 3404(c), 3409.) Until that environmental documentation was completed, the Bureau was authorized by the CVPIA to enter into *interim* renewal contracts of up to three years on the first occasion, and for successive interim periods of up to two years in length thereafter. (CVPIA, § 3404(c).)

In 2007, when the original 1963 water service contract between the Bureau and Westlands Water District was about to expire, the Bureau had not yet completed its environmental documentation necessary for the execution of a long-term (25-year) renewal of the water service contract with Westlands Water District. Accordingly, at that time, Westlands Water District and the Bureau entered into a three-year, interim renewal

---

[16] The 1963 water service contract had originally provided for 40-year renewals. The CVPIA shortened the maximum renewal period to 25 years.

11.

of the water service contract for 1.15 million acre-feet of water. In 2010, Westlands Water District and the Bureau entered into a two-year, interim renewal contract on the same terms. In 2012, when the Bureau had still not completed its environmental documentation, the same parties entered into another two-year, interim renewal contract on the same terms. That two-year, interim renewal contract between Westlands Water District and the Bureau (contract No. 14-06-200-495A-IR3) is one of the six interim contracts at issue in the present appeal.

The other five interim renewal contracts challenged by petitioners were entered into by the Distribution Districts—specifically, four were entered into by Westlands Distribution District No. 1 and one by Westlands Distribution District No. 2, which contracts are briefly summarized below.

Westlands Distribution District No. 1 obtained an assignment of rights from Mercy Springs Water District to 6,260 acre-feet of CVP water, which represents a portion of Mercy Springs Water District's rights under a water service contract entered into in 1967 between the Bureau and Mercy Springs Water District. Beginning in 2000, Westlands Distribution District No. 1 entered into a series of interim renewal contracts with the Bureau for this water. The 2012 two-year, interim renewal contract between Westlands Distribution District No. 1 and the Bureau concerning this water (contract No. 14-06-200-3365A-IR13-B) is one of the contracts at issue in the present appeal.

In 2004, Westlands Distribution District No. 1 obtained an assignment of 2,500 acre-feet of CVP water from Centinella Water District, which rights had belonged to Centinella Water District pursuant to a 1977 water service contract with the Bureau. Since the assignment, Westlands Distribution District No. 1 entered into a series of interim renewal contracts with the Bureau concerning this water. The 2012 two-year, interim renewal contract between Westlands Distribution District No. 1 and the Bureau concerning this water (contract No. 7-07-20-W0055-IR13-B) is one of the contracts at issue in the present appeal.

In 2005, Westlands Distribution District No. 1 was assigned 2,990 acre-feet of CVP water from Widren Water District, the rights to which had belonged to Widren Water District under a 1967 water services contract with the Bureau. Subsequent to the assignment, Westlands Distribution District No. 1 entered into a series of interim renewal contracts with the Bureau concerning this water. The 2012 two-year, interim renewal contract between Westlands Distribution District No. 1 and the Bureau concerning this water (contract No. 14-06-200-8018-IR13-B) is one of the contracts at issue in the present appeal.

In 2007, Westlands Distribution District No. 1 entered into an agreement for the assignment of 27,000 acre-feet of CVP water from Broadview Water District. Broadview Water District had acquired the right to that volume of CVP water in a 1959 water service contract with the Bureau. Since the 2007 assignment, Westlands Distribution District No. 1 entered into a series of interim renewal contracts with the Bureau concerning this 27,000 acre-feet of water, including the 2012 two-year, interim renewal contract (contract No. 14-06-200-8092-IR13), which is one of the contracts at issue in the present appeal.

In 2003, Westlands Distribution District No. 2 entered into an agreement for the assignment of 4,198 acre-feet of CVP water from Mercy Springs Water District. Subsequent to that assignment, Westlands Distribution District No. 2 entered into a series of interim renewal contracts with the Bureau concerning this water, including the 2012 two-year, interim renewal contract (contract No. 14-06-200-3365A-IR13-C). That 2012 interim renewal contract is one of the contracts at issue in the present appeal.

Water Districts' Approvals of the 2012 Interim Renewal Contracts

In December 2011, Water Districts approved the 2012 two-year, interim renewal contracts at issue in this appeal and, in doing so, found that such renewals were exempt from the requirements of CEQA for several reasons. Water Districts' resolutions found that the interim renewal contracts merely involved the ongoing receipt and delivery of water on identical terms as the prior water service contracts, with no expansion of service

13.

and no new facilities constructed. Further, Water Districts found that, to the extent the interim renewal contracts involved any changes, such changes related solely to rates, dates and other minor administrative matters. On these and related factual grounds, Water Districts made specific findings that the renewals were exempt from CEQA, including under the "[o]ngoing" pre-CEQA project exemption (Guidelines, § 15261), the rate-setting exemption (Guidelines, § 15273) and the existing facilities exemption (Guidelines, § 15301).

We note that the Bureau, prior to its approval of interim renewals, performed an environmental assessment under the National Environmental Policy Act of 1969 (NEPA; 42 U.S.C. § 4321 et seq.) concerning the two-year, interim renewal contracts that related to CVP water from the San Luis Unit provided to six particular contractors, including Westlands Water District. The Bureau made findings under NEPA of no significant impact. That is, the interim renewals were "not a major federal action that would significantly affect the quality of the human environment and an environmental impact statement is not required …." (U.S. Dept. Interior, Finding of No Significant Impact (Feb. 2010) p. 1.)

Petitioners' CEQA Lawsuit

Following the approvals of the 2012 interim renewal contracts by Water Districts, petitioners filed their CEQA lawsuit—a petition for writ of mandate—seeking to set aside the approvals based on alleged failure to comply with CEQA. Petitioners' lawsuit alleged that no exemption to CEQA was applicable and that Water Districts were required to undertake environmental review of the interim renewal contracts prior to any approvals thereof. As to potential adverse effects on the environment of entering into the interim renewal contracts, petitioners claimed that the water rights at issue would involve the diversion (by the Bureau) of a substantial volume of water from the Delta, thereby further affecting water flows and water purity in the Delta and harming or endangering certain fish species within that fragile ecosystem. Additionally, petitioners alleged that

14.

Water Districts' delivery of irrigation water to the lands served by Water Districts would contribute to a further buildup of contamination of the soils and water tables with salt, selenium and other pollutants. Since CEQA allegedly applied and was not followed by Water Districts, and because potentially significant environmental impacts were at stake, petitioners requested that the trial court set aside Water Districts' approvals of the 2012 interim renewal contracts.

Trial Court's Rulings

After petitioners' lawsuit was filed, Water Districts moved to dismiss on several procedural grounds, including failure to exhaust administrative remedies, lack of standing, and failure to join an indispensible party. The motion to dismiss was denied.

The hearing on the merits of the petition for writ of mandate was held in the trial court on April 5, 2013. The parties filed trial briefs and appeared and presented oral argument. On April 16, 2013, the trial court issued its written order denying petitioners' petition for writ of mandate.

In its written order, the trial court came to the same conclusions as Water Districts: the interim renewal contracts were exempt from CEQA. As to the "'rate-setting'" exemption found at section 21080, subdivision (b)(8), and Guidelines section 15273, the trial court observed that the interim renewal contracts had the effect of setting rates between the Bureau and Water Districts and, in all other respects, merely continued existing water deliveries without any change. Therefore, the trial court found that this exemption to CEQA was applicable. The trial court next considered the "'ongoing project'" exemption that is set forth in Guidelines section 15621, which the trial court explained was intended to remove from CEQA projects that "were authorized before the adoption of CEQA" and that have "not changed in such a way as to cause new environmental impacts." In discussing this exemption, the trial court found that "the contracts merely continue the project that was originally authorized in 1965, long before CEQA was effective in November of 1970, and therefore the contracts fall within the

15.

'ongoing projects exemption.'" The trial court noted that although there had been some degree of expansion in water deliveries and distribution systems since 1970, "the current round of interim renewal contracts [were] not part of [that] expansion." For these reasons, the trial court found that the ongoing projects exemption applied.

Finally, the trial court held that the "[e]xisting [f]acilities" exemption set forth in Guidelines section 15301 was applicable, since the interim renewal contracts "merely authorized continued water deliveries under the existing system and use of the distribution network to provide those water deliveries." The trial court rejected petitioners' argument that exceptions to this categorical exemption (relating to significant effects on the environment caused by unusual circumstances or cumulative impacts) defeated the existing facilities exemption. Inasmuch as the baseline for the interim renewal contracts was the environment as it existed in December 2011, including all environmental damages that already existed at that time, and because said contracts did not increase or change the existing water deliveries or construct new facilities, the exceptions to the exemption were not established.

In short, the trial court fully agreed with the findings of exemption adopted by Water Districts when the approvals were made.

Petitioners' Appeal and Procedural Issues

After the trial court found the approvals of the 2012 interim renewal contracts were exempt from CEQA, it denied the petition for writ of mandate. A judgment of dismissal followed. Petitioners appeal from that judgment, arguing that Water Districts erred in making findings of exemption from CEQA.

Before proceeding, we note this is not petitioners' first occasion to challenge Water Districts' approvals of interim renewal contracts. Previously, petitioners appealed from a denial of a petition for writ of mandate to set aside *the 2010* two-year, interim renewal contracts—the six interim renewal contracts that immediately preceded those at issue here. We concluded that the appeal was *moot*, since the contracts had expired while

16.

the appeal was pending and all activity under those contracts had ended. Thus, no effective relief concerning those 2010 contracts could be granted. (*North Coast Rivers Alliance v. Westlands Water Dist.* (Apr. 11, 2012, F062357) [nonpub. opn.].) Moreover, in light of the inadequacy of the administrative record, we declined to reach the issues under the discretionary exception by which a court may hear a moot case where the controversy is one that is likely to recur between the parties. (*Ibid*.; see *Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479-480 [stating discretionary exceptions to rules regarding mootness].) Although the issues were capable of repetition, yet evading review, we chose not to address the issues on such an incomplete record.

In the appeal now before us concerning *the 2012* interim renewal contracts, the issues are likewise moot. The contracts expired in February 2014 and all activity under those contracts ended at that time.[17] However, we believe the record in the present appeal is sufficient to allow us to resolve certain key issues that are likely to recur relating to Water Districts' findings of exemption from CEQA and petitioners' challenges thereto. Accordingly, we exercise our discretion to reach those issues in this otherwise moot case.

## DISCUSSION

### I.        Standard of Review

Appellate review under CEQA is de novo in the sense that we review the agency's actions as opposed to the trial court's decision. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard Area*).) However, our inquiry extends only to whether there was a prejudicial abuse of discretion.

---

**17**      On February 28, 2014, the Bureau and Water Districts entered into a new round of two-year, interim renewal contracts on identical terms. We grant Water Districts' request for judicial notice of said 2014 interim renewal contracts.

17.

(§ 21168.5.) "Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard Area*, *supra*, pp. 426-427, fn. omitted.) Therefore, we resolve the CEQA issues before us by independently determining whether the administrative record demonstrates any legal error by Water Districts and whether it contains substantial evidence to support Water Districts' factual determinations.

The instant appeal challenges Water Districts' determinations that the 2012 interim renewal contracts (or the activities authorized thereby) were exempt from CEQA. CEQA exemptions are of two types—*statutory* and *categorical*—both of which were asserted by Water Districts. Since both types of exemptions are at issue in this appeal, we briefly explain the differences between them and the manner in which the standard of review plays out in our consideration of each type of exemption.

### A.    *Statutory Exemptions*

Statutory exemptions, as the term implies, are those enacted by the Legislature. "Because CEQA is statutory in origin, the Legislature has the power to create exemptions from its requirements. Projects and activities can be made wholly or partially exempt, as the Legislature chooses, regardless of their potential for adverse [environmental] consequences." (*Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 966, fn. 8 (*Great Oaks*), relying on *Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 376, 382 [as to each statutory exemption, the Legislature has determined that the exemption promoted an interest important enough to justify foregoing CEQA compliance].) "A critical difference between statutory and categorical exemptions is that statutory exemptions are absolute, which is to say that the exemption applies if the project fits within its terms. Categorical exemptions, on the other hand, are subject to exceptions that defeat the use of the exemption and the agency considers the possible application of an exception in the exemption determination." (*Great Oaks*, *supra*, at p. 966, fn. 8.)

18.

An agency's finding that a statutory exemption applies to a project will be upheld if substantial evidence supports the finding of exemption. (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1311.) "In determining whether an agency's findings concerning the use of a statutory exemption from CEQA may be upheld, we review the administrative record to see that substantial evidence supports each element of the exemption. [Citations.] 'There must be "substantial evidence that the [activity is] within the exempt category of projects." [Citation.] That evidence may be found in the information submitted in connection with the project, including at any hearings that the agency chooses to hold. [Citation.]' [Citation.] … [O]ur application of substantial evidence review in the context of a challenge to an agency's use of a statutory exemption means we determine whether the administrative record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached. All conflicts in the evidence are resolved in support of the agency's action and we indulge all reasonable inferences to support the agency's findings, if possible. [Citations.]" (*Great Oaks*, *supra*, 170 Cal.App.4th at p. 973.)

On the other hand, if we are required to construe the scope of a statutory exemption, to that extent the issue becomes one of statutory interpretation to which we apply de novo review. (*Del Cerro Mobile Estates v. City of Placentia* (2011) 197 Cal.App.4th 173, 179; *Bus Riders Union v. Los Angeles County Metropolitan Transportation Agency* (2009) 179 Cal.App.4th 101, 106-107.)

*B.      Categorical Exemptions*

As directed by the Legislature in section 21084, the Guidelines adopted by the Secretary of the Resources Agency to implement CEQA must include "a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from this division." (§ 21084, subd. (a).) The Guidelines contain such a list of exempt classes of projects, which are known as categorical exemptions. (Guidelines, § 15300 et seq.) These are nonstatutory exemptions for

19.

categories of projects that ordinarily have no significant effect on the environment. For example, as will be discussed later in this opinion, there is a categorical exemption provided in the Guidelines for "[e]xisting [f]acilities," which is defined as the "operation … of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination." (Guidelines, § 15301.) In contrast to statutory exemptions, the categorical exemptions are subject to *exceptions*. Section 15300.2, subdivision (c), of the Guidelines states an important exception: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." Another exception to the categorical exemptions states: "All exemptions for these classes are inapplicable when the cumulative impact of successive projects of the same type in the same place, over time is significant." (*Id.*, subd. (b).)

If an agency has established that a project comes within a categorical exemption, the burden shifts to the party challenging the exemption to show that it falls into one of the exceptions. (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1259 (*Fairbank*).) We apply the substantial evidence test to an agency's factual determination that a project comes within the scope of a categorical exemption. (*Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1187; *Fairbank*, *supra*, at p. 1251.)

Less clear is the standard of review that is applicable to the second part of the agency's analysis—namely, whether *an exception* to the categorical exemption exists. On this question, there is a split of authority. (*Fairbank*, *supra*, 75 Cal.App.4th at pp. 1259-1260 [describing split of authority].) One line of cases has applied the "'fair argument'" standard, holding that a finding of categorical exemption cannot be sustained if there is a fair argument based on substantial evidence in the record that an exception applies (e.g., a reasonable possibility that the activity will have a significant effect on the

environment due to unusual circumstances), even where the agency is also presented with substantial evidence to the contrary. (*Ibid*. [noting a rationale cited for this approach is the analogy to challenges to negative declarations]; see also *Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles*, *supra*, 161 Cal.App.4th at p. 1187.) A number of recent appellate cases have applied the "fair argument" standard to whether an exception has been established, including *Voices for Rural Living v. El Dorado Irrigation Dist*. (2013) 209 Cal.App.4th 1096, 1108, *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 262 (*Banker's Hill*), and *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1202-1204 (*Azusa Land*).

Other cases have applied an ordinary substantial evidence test to questions of fact regarding exceptions to categorical exemptions, deferring to the express or implied findings of the local agency that found a categorical exemption applicable. (*Fairbank*, *supra*, 75 Cal.App.4th at pp. 1259-1260.) Such cases include *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 796 (*Santa Monica*), *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 824, *Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586, 1601, and *Dehne v. County of Santa Clara* (1981) 115 Cal.App.3d 827, 844-845.

We do not need to decide which view is correct because, here, the result is the same even under the less deferential fair argument standard, as will be seen in the part of this opinion discussing Water Districts' claim of categorical exemption for existing facilities. But first we shall consider the statutory exemptions.

## II.     Statutory Rate-setting Exemption

Section 21080, subdivision (b), enumerates certain "activities" to which CEQA does not apply. Subdivision (b)(8) thereof provides that CEQA does not apply to "[t]he establishment, modification, structuring, restructuring, or approval of rates, tolls, fares, or other charges by public agencies which the public agency finds are for the purpose of

21.

(A) meeting operating expenses, including employee wage rates and fringe benefits, (B) purchasing or leasing supplies, equipment, or materials, (C) meeting financial reserve needs and requirements, (D) obtaining funds for capital projects necessary to maintain service within existing service areas, or (E) obtaining funds necessary to maintain those intracity transfers as are authorized by city charter.…"[18] (*Id.*, subd. (b)(8); see also Guidelines, § 15273.) Under this statutory exemption, an agency's setting of rates, fares, tolls or other charges to further one or more of the exempt purposes in the provision (e.g., to maintain existing services or meet operating expenses) does not require CEQA review. (*Great Oaks*, *supra*, 170 Cal.App.4th at p. 969; *Bus Riders Union v. Los Angeles County Metropolitan Transportation Agency*, *supra*, 179 Cal.App.4th at pp. 103, 107-108.) The Guidelines clarify, however, that "[r]ate increases to fund capital projects for the expansion of a system remain subject to CEQA." (Guidelines, § 15273, subd. (b).) In order to qualify for this exemption, the agency is required to incorporate written findings in the record of any proceeding in which an exemption under this section is claimed, and such findings must set forth with specificity the basis for the claim of exemption. (§ 21080, subd. (b)(8); Guidelines, § 15273, subd. (c).)

Water Districts assert that the rate-setting exemption was applicable in this case because the 2012 interim renewal contracts kept the status quo in place and incorporated the terms of prior interim agreements between the parties, without change, some of which had previously included a schedule of water rates. In approving the 2012 interim renewal

---

**18** The first part of the statute refers to the establishment or approval of rates by "public *agencies*" (plural), while later in the same sentence it refers to "the public *agency*" (singular) making the findings that the action furthers one or more of the listed exempt purposes. (§ 21080, subd. (b)(8), italics added.) The reason for this is not apparent, but it may be to allow flexibility and/or to cover situations in which there are layers of approvals involved by more than one public agency concerning the same rate increase. In any event, neither party has made an issue of this wording, therefore we do not address it further.

contracts, Water Districts made express findings that the renewals would simply provide for continued water delivery on the same terms, using the same facilities, without any change or expansion of existing use.  As to rates, Water Districts' 2011 resolutions claimed that the renewals involved only adjustments to rates and related administrative terms to meet operating expenses.  However, the 2012 interim renewal agreements make no mention of any setting or adjustment of rates.

Arguing for the opposite result, petitioners contend that the record does not support the application of the exemption because the 2012 interim renewal contracts did not specify that any action was being taken concerning rates by Water Districts.  We agree with petitioners on this issue.

We begin by noting the factual situation that is generally contemplated by this statutory exemption.  In light of the exemption's reference to rates, tolls and fares[19] charged by public agencies, and the fact that the listed exempt purposes relate to defraying or meeting agency expenses, it appears that the exemption is primarily concerned with the situation where a public agency provides services to customers or the public (e.g., bus transportation) and decides that it must either impose a charge, or alter the amount already charged, for such services (e.g., bus fare increase).[20]  (§ 21080,

---

[19]    In context, each of these terms describes an amount charged to customers for services or similar matters provided by the public agency—e.g., fares for bus transportation, rates for water services, etc.  (See Webster's II, New College Dict. (1995) pp. 919, 1159, 406.)  When a statute sets forth a class of things that have a common nature, theme or character, we give that fact significance (see *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159-1160), keeping in mind that our task is to "determine … the intent of the Legislature by construing in context the language of the statute" (i*d*. at p. 1159).

[20]    As noted in *Great Oaks*, *supra*, 170 Cal.App.4th at page 969, "the statutory ratesetting exemption effectively limits the effect of *Shawn v. Golden Gate Bridge etc. Dist.* (1976) 60 Cal.App.3d 699, in which the court held that a fare increase for existing bus service was a project subject to CEQA review."

subd. (b)(8).)  The cases are consistent with this understanding.  In each of the appellate decisions affirming the application of the rate-setting exemption, a public agency had approved or raised certain rates or fares charged in order to maintain existing levels of service, meet operational expenses related to such services and/or fulfill other exempt purposes under the statute.  (See, e.g., *Bus Riders Union v. Los Angeles County Metropolitan Transportation Agency*, *supra*, 179 Cal.App.4th at pp. 103, 107-108 [exemption applied to bus fares raised by public agency to meet operational expenses and obtain funding needed to maintain service within existing service areas]; *Great Oaks*, *supra*, 170 Cal.App.4th at pp. 973-975 [exemption applied to groundwater rate increases approved for purposes of meeting operational expenses and maintaining service levels in existing service areas]; *Surfrider Foundation v. California Coastal Com.* (1994) 26 Cal.App.4th 151, 155-156 [exemption applied to the California Department of Parks and Recreation's decision to install devices for collection of parking fees at state park beaches, and same exemption applied to the California Coastal Commission's subsequent approval of the Department's decision]; *Condit v. Solvang Mun. Improvement Dist.* (1983) 146 Cal.App.3d 997, 1001 [the district's increase in rates and connection fees for water service to maintain existing service levels was exempt from CEQA].)

Here, the record does not support a finding that, by approving the 2012 interim renewal contracts, Water Districts were thereby setting, adjusting or approving rates *charged to customers* of Water Districts.  Therefore, the present case does not fit within the standard factual pattern for this exemption, as described above.  And even assuming (without deciding) that the statutory exemption could potentially apply to the rates that Water Districts were required to pay[21] to the Bureau for the supplies of CVP water

---

**21**      We note the statute refers to rates or other charges *by* public agencies (§ 21080, subd. (b)(8)), but does not expressly mention rates or charges *against* the public entity seeking the exemption.

24.

delivered by the Bureau to Water Districts, the 2012 interim renewal contracts were silent regarding any such rates. Although it is true the 2012 interim renewal contracts incorporated previous interim agreements, the effect of which was to continue the status quo without change in regard to all preexisting terms (including rate obligations), the 2012 interim renewal contracts did not expressly mention rates or specify that any action was being taken on the issue of rates as such. Nothing explicit was said therein about adjusting, approving or establishing rates. Without more, the record does not show that the 2012 interim renewal contracts (and the approvals thereof) were, in substance, *rate-setting actions* by Water Districts. Therefore, even assuming for the sake of argument that this statutory exemption could, in a proper case, be applied to Water Districts concerning the rates that Water Districts had to pay to the Bureau for CVP water, the exemption was not established by substantial evidence in the present record.

## III.    Statutory Exemption For Pre-CEQA Ongoing Projects

In implementing CEQA, the Guidelines recognize a *statutory* exemption for a project approved prior to November 23, 1970, that is still "being carried out" by the public agency. (Guidelines, § 15261, subd. (a); Guidelines, § 15261(a).)[22] Because November 23, 1970, is the date that CEQA took effect (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 272 (*Friends of Mammoth*); Stats. 1970, ch. 1433, § 1, p. 2780 et seq.), the exemption is evidently founded, at least in part, on the fact that CEQA, as a statutory enactment, was intended by the Legislature to have a prospective, not retroactive, application. (See, e.g., *Communities for a Better Environment v. South*

---

[22]    The Guidelines plainly construe section 15261 as a *statutory* exemption. It is part of article 18 of the Guidelines (expressly entitled "Statutory Exemptions"), which article describes "the exemptions from CEQA granted by the Legislature." (Guidelines, § 15260.) The categorical exemptions are contained elsewhere (i.e., art. 19) in the Guidelines. (Guidelines, § 15300 et seq.) "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area*, *supra*, 40 Cal.4th at p. 428, fn. 5.)

*Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 325, fn. 10 (*Communities for a Better Environment*) [noting that CEQA does not apply retroactively to pre-CEQA projects]; *Nacimiento Regional Water Management Advisory Com. v. Monterey County Water Resources Agency* (1993) 15 Cal.App.4th 200, 201, 206 (*Nacimiento*) [annual water releases from dam/reservoir built prior to enactment of CEQA were exempt as integral part of ongoing pre-CEQA project; parallel federal cases closely considered since NEPA, "like CEQA, … does not apply retroactively"]; Remy et al., Guide to CEQA: Cal. Environmental Quality Act (11th ed. 2007) p. 121; see also *Quarry v. Doe I* (2012) 53 Cal.4th 945, 955 [all statutes presumed to be prospective, not retroactive, unless a contrary intention is clearly indicated by Legislature];[23] §§ 21169-21171.)[24]

---

[23] No indication of a contrary intention regarding CEQA's application has been brought to our attention, and we are aware of none. (See Stats. 1970, ch. 1433, § 1, p. 2780 et seq.; § 21000 et seq.)

[24] Sections 21169 to 21171 are indicative of the Legislature's perspective. These sections were passed in 1972 in response to the Supreme Court's decision in *Friends of Mammoth*, *supra*, 8 Cal.3d at pages 252 and 257, which held that CEQA applied to private as well as public projects. In resolving that issue of statutory interpretation, the Supreme Court denied a request to make its ruling prospective only (*Friends of Mammoth*, *supra*, at p. 272). That denial created a problem: Many *private* projects had been approved (post-CEQA) based on the assumption that CEQA only applied to public projects, and such approvals had been detrimentally relied upon. To remedy this problem, sections 21169 to 21171 were passed as emergency measures on December 5, 1972. (*Cooper v. County of Los Angeles* (1977) 69 Cal.App.3d 529, 533.) Generally speaking, these sections alleviated the hardships resulting from the Supreme Court's decision by grandfathering the affected approvals. (*Ibid*.; *Azusa Land*, *supra*, 52 Cal.App.4th at pp. 1216-1218; *Bresnahan v. City of Pasadena* (1975) 48 Cal.App.3d 297, 306.) In doing so, the sections were worded broadly to cover private projects that were approved "before" specified post-CEQA dates. (See §§ 21169, 21171.) Notably, that same wording was *also* broad enough to extend back to projects approved before CEQA became law, which we believe supports or reinforces the premise that CEQA was not intended to apply retroactively to pre-CEQA projects. A footnote in a recent Supreme Court decision referred to section 21169 in connection with a discussion of the principle that CEQA does not apply "retroactively to pre-CEQA projects." (*Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 325, fn. 10.) Section 21171 contains similarly broad wording, which the same footnote referred to as "the 1972 moratorium

26.

The full text of section 15261(a) of the Guidelines provides, under the heading "Ongoing Project," as follows:

> "If a project being carried out by a public agency was approved prior to November 23, 1970, the project shall be exempt from CEQA unless either of the following conditions exists:

> "(1)  A substantial portion of public funds allocated for the project have not been spent, and it is still feasible to modify the project to mitigate potentially adverse environmental effects, or to choose feasible alternatives to the project, including the alternative of 'no project' or halting the project; provided that a project subject to the National Environmental Policy Act (NEPA) shall be exempt from CEQA as an on-going project if, under regulations promulgated under NEPA, the project would be too far advanced as of January 1, 1970, to require preparation of an EIS.

> "(2)  A public agency proposes to modify the project in such a way that the project might have a new significant effect on the environment."

As this language clearly indicates, the exemption includes the situation where a public agency carries out an action today that is an inherent part of an ongoing project approved before CEQA took effect.  (Guidelines, § 15261(a) [the project "approved" prior to November 23, 1970, is "being carried out" by the agency].)[25]  The key issue in analyzing the exemption is whether the challenged action is "a normal, intrinsic part of the ongoing operation" of a project approved prior to CEQA, rather than an expansion or modification thereof.  (*Nacimiento*, *supra*, 15 Cal.App.4th at p. 205; accord, *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 968-969 (*Amador*).)

In *Nacimiento*, a government agency built a dam and reservoir prior to the enactment of CEQA.  The agency's application to build the project had provided for

for ongoing projects."  (*Communities for a Better Environment*, *supra*, at p. 325, fn. 10.) Sections 21169 to 21171 are implemented in Guidelines section 15261, subdivision (b).

[25]     In so stating, we are not yet addressing the potential applicability of the exceptions set forth in Guidelines section 15261(a).

operation of a reservoir, including the storing and periodic release of water in varying amounts and for different uses. The plaintiff in that case challenged the agency's 1991 decision to release large amounts of water that year to benefit various interests downstream. The appellate court held that the agency's annual decision to release water to competing interests was an inherent part of an ongoing project and exempt from CEQA. (*Nacimiento*, *supra*, 15 Cal.App.4th at pp. 201, 204-208.) The court explained: "Whether an activity requires environmental review depends upon whether it expands or enlarges project facilities or whether it merely monitors and adjusts the operation of existing facilities to meet fluctuating conditions." (*Id*. at p. 205. ) Since the project in that case did not involve enlargement of capacity to divert water or make other material revisions, but instead continued operations within existing parameters, it fell within the ongoing project exemption and did not require CEQA review. (*Nacimiento*, *supra*, at pp. 207-208; see also *Amador*, *supra*, 76 Cal.App.4th at pp. 968-969 [stating the same test, but holding the exemption did not apply there because of "remarkable" change in proposed operation of the project from nonconsumptive to consumptive water use]; cf. *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 806-808 [the city's additional pumping facilities and expanded groundwater extraction increased the intensity and scope of the original aqueduct program; therefore, environmental review of the expanded groundwater extraction was required].)

In the instant appeal, petitioners argue that the exemption for ongoing projects did not apply because there were expanded operations in the years after CEQA took effect, creating significant effects on the environment beyond that of the originally conceived project. Allegedly, the 2012 approvals necessarily included the post-CEQA expansions and, therefore, could not come within the terms of the exemption. Taking the contrary position, Water Districts maintain that substantial evidence in the record adequately supported their findings that the 2012 interim renewal contracts and the activity

contemplated therein came within the scope of the exemption for pre-CEQA ongoing projects.

We conclude Water Districts are correct. That is, there is substantial evidence in the record to support the Water Districts' claim of statutory exemption under Guidelines section 15261(a). As explained in due course below, this conclusion is evidenced by a comparison of the nature of the original pre-CEQA project and the current activity challenged by petitioners. That comparison reflects that the matters presently challenged by petitioners are merely an incidental part of the original, ongoing pre-CEQA project— and therefore exempt.

### A. *CEQA's Definition of a Project*

Before considering whether there is an ongoing pre-CEQA project here, we first note how CEQA defines a *project*. Under CEQA, a "[p]roject means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.) The Guidelines elaborate that a "'[p]roject' means *the whole of an action,* which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment" and which is undertaken, supported or approved by a public agency. (Guidelines, § 15378, italics added.) The Guidelines further clarify that "[t]he term 'project' refers to *the activity which is being approved* and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c), italics added.) The question of the nature or scope of a

29.

project may be decided by the appellate court based on undisputed facts in the record. (*Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 272.)

> B.     The Pre-CEQA Ongoing Project

Our next step is to ascertain the nature of the original project or *activity* that was *approved* prior to November 23, 1970.  Since we will be discussing matters that occurred long before the two Distribution Districts were formed, the focus of our discussion of pre-CEQA events will be on *Westlands Water District*.  Consistent with the parties' briefing of this issue, our examination of the record will include both (i) the water distribution facilities constructed for Westlands Water District's use and operation and (ii) the CVP water that (depending on availability) Westlands Water District was entitled to receive and distribute annually for use on lands within Westlands Water District's service area.

> 1.     Water Delivery Facilities Approved Pre-CEQA

"'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person.…"  (Guidelines, § 15352, subd. (a).)[26]  *Contracts* by which the public agency has effectively committed itself to a definite course of action on a project are sufficient to constitute approval.  (See *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 134-139 (*Save Tara*); *City of Santee v. County of San Diego* (2010) 186 Cal.App.4th 55, 66-68 [applying *Save Tara* principles to agreements between public agencies regarding a public project]; *City of Irvine v. County of Orange* (2013) 221 Cal.App.4th 846, 859 [same].)  Generally speaking, an agency acts to approve a proposed course of action

---

**26**     Since the term "'any person'" is broad and includes both public entities and private parties, it is clear that the definition of "'approval'" provided in Guidelines section 15352, subdivision (a), applies to both public and private CEQA projects. (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 719; Guidelines, § 15376.)

when it makes its *earliest* firm commitment to it, not when the final or last discretionary approval is made. (*Save Tara*, *supra*, at p. 134.)

At this point in our analysis, we consider the *facilities* aspect of the purported ongoing project. That is, we determine whether the record is sufficient to support the conclusion that Westlands Water District, by means of contractual commitments or other agency determinations made prior to CEQA's enactment, approved at that time the construction of its water distribution facilities, including the canals, laterals and other infrastructure that currently is used to receive and deliver its CVP water supplies. We believe that such a conclusion is supported by substantial evidence, as explained below. (See *Great Oaks*, *supra*, 170 Cal.App.4th at p. 973 [substantial evidence test applies to factual questions regarding application of *statutory* exemption].)

On April 1, 1965, Westlands Water District entered into a contract with the Bureau providing for the construction of a "water distribution and drainage collector system." (U.S. Dept. Interior, Bureau of Reclamation, Contract Between U.S. & Westlands Water Dist. (Apr. 1, 1965) p. 2.) The water distribution system was to include a lateral conveyance system, primarily of enclosed pipe and related facilities, all of which was to generally conform to an attached plan in an exhibit A thereto (a feasibility plan showing the layout and approximate location of the laterals and sublaterals). By executing the contract, the Bureau agreed to construct such facilities at a total cost not to exceed $157,048,000, and Westlands Water District agreed to repay such construction costs and other related expenses over a period of 40 years. The construction was to be carried out in several phases, with the final two phases to begin no later than specified dates in the mid-to-late 1970's.[27] The water distribution system was to provide facilities

---

[27] Guidelines section 15261(a) only requires that the project was *approved* prior to November 23, 1970; it does not require that the project be constructed or finished prior to that date.

31.

for the delivery of CVP water to irrigable lands within Westlands Water District's boundaries, consisting at that time of approximately 400,000 acres. On April 14, 1964, Westlands Water District approved the above contract by resolution No. 150-64, stating that "it is contemplated that the extent of the … distribution facilities, required for the lands within the District will increase over a period of years and, therefore, it is desirable that provision for their ultimate construction be made at this time .…"

Effective June 29, 1965, the Legislature enacted special legislation known as the Westlands Water District Merger Law (Wat. Code, § 37800 et seq.), which merged the adjacent West Plains Water Storage District into Westlands Water District.[28] West Plains Water Storage District had serviced the water needs of the neighboring lands on the westerly side of Westlands Water District. The purpose of the merger was to secure greater economy of administration and more effective utilization of CVP water from the San Luis Unit in order to maximize the beneficial use of CVP water in the area. (Wat. Code, §§ 37801, 37820-37821). The law affirmed that Westlands Water District, as the surviving entity, "is a public agency of the state." (Wat. Code, § 37823.) Lands within the original premerger area of Westlands Water District (sometimes called Priority Area I) were to continue to have prior water rights (pursuant to an existing contract with the Bureau) over the new lands added by virtue of the merger with West Plains Water Storage District (sometimes called Priority Area II). (Wat. Code, § 37856.) Documents in the administrative record reflect that the merger added approximately 200,000 acres to Westlands Water District; thus, after the merger, Westlands Water District's service area encompassed more than 600,000 acres.

---

[28] The merger was apparently recommended by federal officials. In 1964, a memorandum by an Assistant Secretary of the United States Department of the Interior for Water and Power Development to the Secretary of the United States Department of the Interior promoted the advantages of such a merger.

In 1965, after the above described merger, Westlands Water District adopted a resolution that requested and authorized the Bureau to immediately begin the work necessary for construction of a sufficient water delivery system for the enlarged district pursuant to the existing repayment plan in the April 1, 1965, construction contract and invited negotiation of any amendatory repayment plan as the Bureau may deem necessary. In 1966, a plat was prepared identifying rights-of-way for distribution system laterals serving all of the areas within Westlands Water District's postmerger boundaries. By 1968, the Bureau's official publications and other written documentation acknowledged that the water distribution system under construction by the Bureau would be used to serve approximately 600,000 acres of Westlands Water District. During that same year, the Bureau and Westlands Water District entered into a supplemental contract to expedite the construction of the water distribution system within Westlands Water District's boundaries (understood as comprising approximately 600,000 acres), which contract also provided for Westlands Water District to receive an additional 1.4 million acre-feet of water within a 10-year period (the 1968 supplemental contract). The 1968 supplemental contract (entitled "Contract for Short Term Water Service") was approved by resolution of Westlands Water District in 1968.

In our estimation, the foregoing evidence was more than sufficient to show that prior to November 23, 1970, Westlands Water District (and the Bureau) had committed to a definite course of action (i.e., given approval) as to the proposed construction and layout of the facilities that are presently used and operated by Westlands Water District to receive and deliver CVP water supplied by the Bureau from the San Luis Unit of the CVP.

### 2. *Water Quantities Approved Pre-CEQA*

The above described permanent facilities were obviously approved by Westlands Water District for the purpose of receiving and distributing CVP water for beneficial use on the lands within Westlands Water District's boundaries. One might reasonably expect

that the same project would *also* entail Westlands Water District's entitlement to actually receive quantities of CVP water each year for that purpose. While that is indeed the case here, the more difficult question factually is *how much water* was approved by Westlands Water District pre-CEQA.

Again, since we are analyzing a *statutory* exemption, the applicable standard of review concerning factual matters is the substantial evidence test. (*Great Oaks*, *supra*, 170 Cal.App.4th at p. 973.) The question is whether substantial evidence in the record supports the conclusion that, prior to November 23, 1970, Westlands Water District effectively committed itself to a definite course of action to obtain certain quantities of CVP water. As we proceed to explain, we believe that contractual commitments with the Bureau showed that such pre-CEQA approval *did*, in fact, occur as to quantities of CVP water corresponding to what Westlands Water District is currently entitled to receive.

We begin with the 1963 water service contract between the Bureau and Westlands Water District. The 1963 water service contract provided Westlands Water District with CVP water rights of 1,008,000 acre-feet per year through 1979, and 900,000 acre-feet per year thereafter. The term of the water service contract was 40 years, commencing with the first water deliveries of CVP water, with renewals for additional 40-year terms expressly contemplated. The 40-year term of the 1963 water service contract expired at the end of 2007.

We note the 1963 water service contract was entered into *before* Westlands Water District merged with West Plains Water Storage District. Thus, by itself, the 1963 water service contract only shows that a right was established to 900,000 acre-feet per year (after 1979) for the lands in the original Westlands Water District (known as Priority Area I). Furthermore, as indicated by the chain of interim renewal contracts entered into after the 1963 water service contract expired, Westlands Water District's *present* contractual entitlements are for 1.15 million acre-feet per year of CVP water, an increase

34.

of 250,000 acre-feet from the 1963 contract. The question is: was the right to the additional 250,000 acre-feet approved prior to the effective date of CEQA?

According to Water Districts, Westlands Water District's right to the additional 250,000 acre-feet of water per year, which was needed to serve the lands within the former West Plains Water Storage District (Priority Area II), can be traced to another contractual commitment entered into prior to CEQA's effective date. Specifically, Water Districts refer to the 1968 supplemental contract with the Bureau, which provided Westlands Water District an extra 1.4 million acre-feet of water that would be supplied within a period of 10 years. Water Districts note that if the 1.4 million acre-feet were divided evenly over the 10 years, the resulting 140,000 acre-feet per year, plus the existing 1,008,000 acre-feet to which Westlands Water District was entitled (through 1979) under the 1963 water service contract, would total 1,148,000 acre-feet (equivalent to 900,000 plus an additional 248,000 acre-feet). If so calculated, the 1968 supplemental contract made provision for nearly the exact amount of additional water that was needed, at least for a significant period of time.

The 1968 supplemental contract remained in effect until 1972;[29] thereafter, water supplies needed to serve the area formerly within West Plains Water Storage District were consistently allocated by the Bureau and provided to Westlands Water District each year from 1972 through 1981 pursuant to a series of annual contracts. Thereafter, additional water supplies were consistently allocated by the Bureau pursuant to a further stipulated agreement. Westlands Water District pursued litigation to have its right to the extra 250,000 acre-feet per year judicially declared. It asserted, among other things, that the United States Department of the Interior had advocated the merger that created the

---

[29]     It is not apparent why the 1968 supplemental contract ended at that time.

35.

additional water need.[30]  In 1986, Westlands Water District's right to the additional 250,000 acre-feet per year was recognized in a stipulated judgment known as the *Barcellos* judgment (*Barcellos & Wolfsen, Inc. v. Westlands Water Dist.* (E.D.Cal., No. CV 79-106-EDP).[31]

The *Barcellos* judgment also stipulated that the Bureau and the United States Department of the Interior had known, at least since the 1965 merger of Westlands Water District with West Plains Water Storage District, that an additional "firm water supply" of 250,000 acre-feet of water per year was needed.  By the time of the Bureau's approval of the 1968 supplemental contract, the Bureau acknowledged (as evidenced by official publications and other records) that the water distribution system it was building for Westlands Water District would serve the entire 600,000 acres, thereby indicating it understood the water deliveries to be provided thereby were for the postmerger Westlands Water District.  Both the 1963 water service contract and the 1968 supplemental contract were formally approved by resolutions of Westlands Water District in those years.

We agree with Water Districts that the above facts, including the contracts entered into between Westlands Water District and the Bureau in 1963 and 1968, and reasonable inferences therefrom, constituted substantial evidence that the entire 1.15 million acre-feet of water to which Westlands Water District is presently entitled each year can be traced back to the contractual commitments made prior to the advent of CEQA.  The

[30]     A memorandum from the Assistant Secretary of the United States Department of the Interior for Water and Power Development, to the Secretary of the United States Department of the Interior, dated October 1964, pointed out the advantages of such a merger and indicated the tentative prospects of long-term water becoming available in the future to meet the water needs of the area comprising the present West Plains Water Storage District.

[31]     This was a compromise of claims; the Bureau was willing to recognize this right, but did not expressly admit that Westlands Water District's claims were valid.

900,000 acre-feet of water was clearly a long-term right as established in the 1963 water service contract. The 1968 supplemental contract appears to have provided for the additional (nearly) 250,000 acre-feet of water per year and, although it was relatively short-lived, the subsequent annual agreements as well as the litigation culminating in the *Barcellos* judgment, demonstrated Westlands Water District's ongoing commitment, legally and financially, to continue to receive that additional 250,000 acre-feet of water that was traceable back to the 1968 supplemental contract. Accordingly, the entire 1.15 million acre-feet of water that Westlands Water District is entitled to receive through its existing facilities was approved prior to CEQA's enactment.

    *C.    Comparison of Original Project to the Presently Challenged Action(s)*

The applicability of the ongoing projects exemption depends on whether the challenged action is "a normal, intrinsic part of the ongoing operation" of a project approved prior to CEQA, rather than an expansion or modification thereof. (*Nacimiento*, *supra*, 15 Cal.App.4th at p. 205; accord, *Amador*, *supra*, 76 Cal.App.4th at pp. 968-969.) Here, as discussed above, the original pre-CEQA project included the construction and operation of Westlands Water District's existing facilities to receive CVP water and to deliver that water to customers within Westlands Water District's boundaries. Moreover, the original pre-CEQA project included the entirety of the 1.15 million acre-feet of water to which Westlands Water District is presently entitled to receive by contract.

The currently challenged action or project consisted of the activity stemming from Water Districts' approval of the 2012 interim renewal contracts. By far the largest such contract was the interim renewal contract between Westlands Water District and the Bureau, which we treat separately. This contract incorporated the terms of the prior interim renewal contracts between said parties, thereby continuing without change Westlands Water District's right to receive 1.15 million acre-feet of water per year for use on lands within Westlands Water District boundaries, on the same terms as before. This contract involved a brief, two-year continuation of the same activity that was

approved prior to CEQA, which activity Westlands Water District had been carrying out on an ongoing basis since that original pre-CEQA approval. As such, substantial evidence supported the conclusion that the activity contemplated in the 2012 interim renewal contract with Westlands Water District came within the ongoing projects exemption set forth in Guidelines section 15621(a).

The other five interim renewal contracts at issue herein were entered into by the Distribution Districts. The Distribution Districts acquired, post-CEQA, the assignment of water rights from other west side districts receiving CVP water from the San Luis Unit. In this way, quantities of CVP water that other districts were entitled to receive (preassignment) could be made available to lands within the service area of Westlands Water District. That was one of the purposes for forming the Distribution Districts in 2000 and 2002. The assigned water rights included 6,260 acre-feet of water from Mercy Springs Water District; 2,500 acre-feet of water from Centinella Water District; 2,990 acre-feet of water from Widren Water District; 27,000 acre-feet of water from Broadview Water District, and an additional 4,198 acre-feet of water from Mercy Springs Water District. As the holders of the assigned water rights, the Distribution Districts were (and are) the contracting parties for purposes of entering into any renewals thereof with the Bureau, including the 2012 interim renewal contracts executed by the Distribution Districts.

Petitioners contend the above referenced assignments were expansions of the original scope of the pre-CEQA project, allegedly making the ongoing project exemption inapplicable. Petitioners argue the present case is similar to *County of Inyo v. Yorty*, *supra*, 32 Cal.App.3d 795, where an expansion in the extraction of groundwater and the use of added pumping facilities after CEQA took effect was considered a new project, severable from the original pre-CEQA aqueduct and, therefore, environmental review of that expanded water extraction program was required. (*County of Inyo v. Yorty*, *supra*, at pp. 804-808.) Water Districts' position is that the assignment agreements merely

38.

provided a small degree of flexibility that did not appreciably expand the activity involved in the original pre-CEQA project.

In support of Water Districts' argument, there was substantial evidence in the record (including environmental documents prepared by the Bureau) that the water assignments merely afforded a measure of flexibility to potentially offset or minimize the shortages that regularly occurred in all but the wettest years regarding Westlands Water District's water needs. That is, because the Bureau frequently had to reduce water allotments to levels well below the contracted amounts (due to regulatory constraints and other factors), the water assignments were needed to alleviate that deficiency and help bring the actual volume of water received by Westlands Water District somewhat closer to the originally contracted amounts, using existing facilities. Considered in that light, the assignment agreements (and renewals thereof) entered into by the Distribution Districts did not result in an expansion or material modification of the *underlying activity* that was approved in the original pre-CEQA project. Rather, the practical and primary effect of the assignment agreements was to facilitate the ability of Westlands Water District to receive a stable and adequate supply of water *within the scope and parameters* of the approved pre-CEQA original project. As such, the assignments were within the scope of, and incidental to, the ongoing original project. Additionally, unlike the situation in *County of Inyo v. Yorty*, *supra*, 32 Cal.App.3d 795, where there was a post-CEQA program that substantially increased groundwater extraction using new pumping facilities, here the assignments concerned existing CVP water rights as to water that was already (historically) being supplied to someone through the CVP by the Bureau, and that assigned water was to be delivered using only existing facilities, without any expansion. Therefore, we conclude there was substantial evidence that the activity authorized by the 2012 interim renewal contracts (the assignment agreements) entered into by the Distribution Districts were within the ongoing projects exemption of Guidelines section 15261(a).

But even assuming the 2012 interim renewal contracts entered into by the Distribution Districts were not part of (or incidental to) the original ongoing project, we would still find them to be exempt under the categorical exemption for existing facilities (see Guidelines, § 15301), which is addressed in part IV. of this opinion. The same would also be true of the 2012 interim renewal contract entered into by Westlands Water District. That is, all six of the 2012 interim renewal contracts fit within that categorical exemption, as will be seen, even if the ongoing projects exemption is inapplicable.

> D.      *Special Exceptions Not Applicable*

We briefly mention the two exceptional situations referred to in Guidelines section 15261(a), in which the statutory exemption would not apply. First, under Guidelines section 15261(a)(1), an ongoing project approved prior to CEQA is exempt unless "[a] substantial portion of public funds allocated for the project have not been spent, and it is still feasible to modify the project to mitigate potentially adverse environmental effects .…" Here, the ongoing project before us was not in its early or formative stages, financially or otherwise. The facilities approved prior to CEQA were long ago completed, and the contractual water entitlements that were initiated prior to CEQA remain in place. Thus, the original project is funded, built-out, established in its operational parameters and continues to be carried out on those terms each year. Nothing in the record suggests that a substantial portion of funding approved prior to CEQA remains unspent. We conclude that the exceptional situation described in subdivision (a)(1) of Guidelines section 15261 is not present here.

Second, subdivision (a)(2) of Guidelines section 15261 states that an ongoing project approved prior to CEQA is exempt unless "a public agency proposes to modify the project in such a way that the project might have a new significant effect on the environment." No such current or new proposal for a modification of the project is before us. In any event, even examining past occurrences relating to the project, there is (as discussed above) substantial evidence to support the conclusion that even the water

assignment agreements were not expansions of the original project, but were within the scope of, and incidental to, such project.  In sum, the entire underlying activity that was approved prior to CEQA has remained essentially unchanged.  Hence, the particular situation described in subdivision (a)(2) of Guidelines section 15261 is not present here.

E.      *Conclusion Regarding Ongoing Project Exemption*

We conclude that Water Districts' approvals of the six 2012 interim renewal contracts came within the statutory exemption for ongoing projects as set forth in Guidelines section 15261(a).  Substantial evidence confirmed that, pursuant to said 2012 interim renewal contracts, CVP water would continue to be delivered within the parameters of the original pre-CEQA project for an additional two years, using the same facilities that were approved pre-CEQA.  On that record, Water Districts correctly found the approvals to be exempt from compliance with CEQA.

IV.    **Categorical Exemption For Existing Facilities**

We now consider the applicability to this case of the *categorical* exemption for the continued use of existing facilities at the same level of use.  As noted earlier herein, categorical exemptions are not statutory in nature but are enumerated in the Guidelines to identify classes or categories of projects that ordinarily have no significant effect on the environment.  (See § 21084, subd. (a); Guidelines, § 15300 et seq.)  They are always subject to basic exceptions delineated in the Guidelines.  (Guidelines, § 15300.2, subds. (b) & (c).)

A categorical exemption (numbered class 1) is recognized in the Guidelines for "the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination."  (Guidelines, § 15301.)  Examples in the Guidelines of the types of projects covered by this exemption include "[e]xisting facilities of …  publicly-owned utilities used to provide electric power, natural gas, sewerage, or other

41.

public utility services." (Guidelines, § 15301, subd. (b).) A water distribution system is an existing facility for purposes of this categorical exemption. (*Turlock Irrigation Dist. v. Zanker* (2006) 140 Cal.App.4th 1047, 1065-1066.) "The key consideration is whether the project involves negligible or no expansion of an existing use." (Guidelines, § 15301; see also *Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 326 [summarizing cases holding that "the continued operation of an existing facility without significant expansion of use … [is] exempt from CEQA review under CEQA Guidelines section 15301"].)

Here, the project or activity authorized by Water Districts' approvals of the 2012 interim renewal contracts was *a continuation for two years without any changes* of the following: (i) use of existing facilities that were constructed in the past for the purpose of receiving and delivering CVP water and (ii) operation of those facilities to actually receive CVP water from the Bureau and deliver that water to customers for irrigation purposes on lands within Water Districts' service areas. The amounts of CVP water at stake were the quantities specified in the chain of prior contracts between Water Districts and the Bureau, the terms of which were expressly continued without change. On this record, it is clear that the relevant activity came within the scope of the categorical exemption for existing facilities. Therefore, the categorical exemption prevails unless an *exception* defeats it.

### A. Exceptions to Exemption

Guidelines section 15300.2 sets forth the exceptions to categorical exemptions. It provides that categorical exemptions are inapplicable under certain conditions, including "where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances" (i*d*., subd. (c)), *and* "when the cumulative impact of successive projects of the same type in the same place, over time is significant" (i*d*., subd. (b)). Petitioners assert that these two exceptions were established in the

42.

present case. Before discussing these exceptions further, we briefly reiterate the legal landscape regarding the applicable standard of review in this unique CEQA context.

Where, as here, an agency has established that a project comes within a categorical exemption, the burden shifts to the party challenging the exemption to show that it falls into one of the exceptions. (*Fairbank*, *supra*, 75 Cal.App.4th at p. 1259.) The substantial evidence test applies to an agency's factual determination that a project comes within the scope of a categorical exemption. (*Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles*, *supra*, 161 Cal.App.4th at p. 1187; *Fairbank*, *supra*, at p. 1251.) However, as we observed in part I. of this opinion, there is a split of authority concerning the standard of review applicable to the second stage of the agency's analysis—that is, whether the project falls within *an exception* to the categorical exemption. (*Fairbank*, *supra*, at pp. 1259-1260; *Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 855-856.) Some courts have applied the """"fair argument"""" standard, meaning that a categorical exemption is defeated if there is a fair argument based on substantial evidence in the record that an exception is established; while other courts have applied the ordinary substantial evidence test to questions of fact relating to exceptions to categorical exemptions, deferring to the express or implied findings of the local agency that found a categorical exemption applicable. (*Hines v. California Coastal Com.*, *supra*, at p. 856)**32**

We find it unnecessary to decide which of these views is correct because the result is the same in this case even under the less deferential fair argument standard, as we presently explain.

---

**32**    Additional cases discussing the views on the applicable standard of review are set forth in our earlier discussion herein under part I., Standard of Review.

## 1. No Significant Effect Due to Unusual Circumstances

Guidelines section 15300.2, subdivision (c), provides that "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." "The application of Guidelines section 15300.2(c) involves two distinct inquiries. First, we inquire whether the Project presents unusual circumstances. Second, we inquire whether there is a reasonable possibility of a significant effect on the environment *due to* the unusual circumstances." (*Banker's Hill*, *supra*, 139 Cal.App.4th at p. 278.) "A negative answer to either question means the exception does not apply." (*Santa Monica*, *supra*, 101 Cal.App.4th at p. 800.)

### (a) Unusual Circumstances

"[U]nusual circumstances" are those that (i) "differ from the general circumstances of the projects covered by the particular categorical exemption" and (ii) "create an environmental risk that does not exist for the general class of exempt projects." (*Azusa Land*, *supra*, 52 Cal.App.4th at p. 1207.) What is "'*unusual*'" is "judged relative to the *typical* circumstances related to an otherwise typically exempt project." (*Santa Monica*, *supra*, 101 Cal.App.4th at p. 801.) An unusual circumstance is "'some feature of the project that distinguishes it' from others in the exempt class." (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1381 (*San Lorenzo*).)

Water Districts rely on the fact that Guidelines section 15301 lists, as an example of the type of project to which the existing facilities exemption would apply, "publicly-owned utilities" that are used to provide such things as "electric power, natural gas, sewerage, or other public utility services." (Guidelines, § 15301, subd. (b).) A public agency providing water services to customers is also a utility. (See *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 620 [water district is "a public utility which provides water to residents in its service

area"].)  Water Districts argue the project here did not involve unusual circumstances because, allegedly, it is not uncommon for utility-type public agencies to (i) have large-scale facilities operating at a large volume[33] and (ii) impact the environment to some extent simply by existing and functioning as utilities (e.g., power plants, transmission lines, dams, water diversion facilities, or sewage treatment facilities).[34]  To summarize Water Districts' position, neither the large scale of operations nor the incidental impacts were "unusual" for a utility-type project.  Therefore, according to Water Districts, there are no unusual circumstances present and the exception does not apply.

---

[33]     Water Districts listed a number of cases showing that public utilities may exist on a large scale; however, none of the identified cases dealt with the existing facilities exemption or the significant-effects exception thereto.  (See, e.g., *Pacific Gas & Electric Co. v. City and County of San Francisco* (2012) 206 Cal.App.4th 897, 900 [hydroelectric project and power lines serve City and County of San Francisco]; *Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 772-774 [Imperial, Coachella, Metropolitan and San Diego districts import almost 4 million acre-feet of water per year and serve vast areas with thousands of canals and related distribution facilities]; *Southern California Gas Co. v. South Coast Air Quality Management Dist.* (2011) 200 Cal.App.4th 251, 258, 264 [utility's natural gas facilities cover 20,000 square miles, including pipeline receiving point that directs up to 1.2 billion cubic-feet per day of natural gas into Southern California]; *Sonoma County Water Coalition v. Sonoma County Water Agency* (2010) 189 Cal.App.4th 33, 38 [water agency's diversion and distribution facilities located in Russian River watershed serve 600,000 people]; *City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 622 [city's wastewater treatment facilities process and discharge hundreds of millions of gallons of sewage per day].)

[34]     Water Districts refer to cases of utility-type operations that affected the environment as part of their usual operation.  (See, e.g., *Outfitter Properties, LLC v. Wildlife Conservation Bd.* (2012) 207 Cal.App.4th 237, 242 [hydroelectric project consisting of diversion dams, miles of canals, and power plants affects sensitive species and habitat]; *Sonoma County Water Coalition v. Sonoma County Water Agency*, *supra*, 189 Cal.App.4th at pp. 43, 46-47 [diversion and distribution facilities located in the Russian River watershed affect endangered salmonid species and their habitat]; *Center for Biological Diversity, Inc. v. FPL Group*, *Inc.* (2008) 166 Cal.App.4th 1349, 1355 [wind turbine generators operating in Altamont Pass kill and injure eagles, hawks, falcons, owls, etc.].)  We note these cases did not involve the precise issues under consideration here.

45.

Petitioners argue that Water Districts' view of what is "unusual" is too narrow. According to petitioners, since the water received by Water Districts comes from the CVP, which draws its water from the Delta, the diversion of more than 1 million acre-feet of water each year (or the portion thereof allotted by the Bureau) could potentially have an adverse effect on certain threatened fish populations and fragile habitat in the Delta. Additionally, petitioners assert that the water's use for irrigation purposes could potentially add to the salt and selenium content in the soil and groundwater in the Westlands Water District area due to lack of drainage. According to petitioners, these constitute potential significant effects on the environment. Moreover, petitioners argue that to the extent there is a reasonable possibility the activity will lead to significant environmental effects, the unusual circumstances requirement is met and the exception set forth in Guidelines section 15300.2, subdivision (c), is established.

Here, assuming for the sake of argument that petitioners are correct that the large scale of the water diversion at issue (combined with the fragile fish ecosystem in the Delta and the salt/selenium issues on the west side) constituted "unusual" circumstances, that premise would only satisfy one element of this exception. In order for the exception to apply, petitioners would *also* have to establish that there is a reasonable possibility the activity will have *a significant effect on the environment* due to such circumstances.

In passing, we note there is a difference of opinion in the Courts of Appeal on how to apply the unusual circumstances language in Guidelines section 15300.2, subdivision (c). Most courts indicate there must be a showing of *both* unusual circumstances *and* a reasonable possibility of a significant effect on the environment due to such unusual circumstances. (See, e.g., *Santa Monica*, *supra*, 101 Cal.App.4th at pp. 800-801; *San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1395; *Fairbank*, *supra*, 75 Cal.App.4th at p. 1260.) Others appear to collapse the two elements into one, suggesting that if there is a reasonable possibility of a significant effect on the environment, that fact *alone* is sufficient to establish this exception. (See, e.g., *Communities for a Better*

46.

*Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 129-130.)[35] In the present case, it is unnecessary to resolve or harmonize these differences regarding the unusual circumstances requirement because here the exception fails under the *second* requirement. That is, once a correct environmental baseline is applied to assess the project's impacts, it is clear that petitioners have failed to meet the requirement of showing a reasonable possibility of a *significant effect* on the environment, as explained below.

### *(b)* *No Significant Effect on the Environment*

In addition to the unusual circumstances requirement, the exception under consideration also requires "a reasonable possibility that the activity will have a significant effect on the environment …." (Guidelines, § 15300.2, subd. (c).) Thus, if no basis for a *significant effect on the environment* is shown, the exception is not established. A "'[s]ignificant effect on the environment' means a substantial, or potentially substantial, adverse *change* in the environment." (§ 21068, italics added; see also Guidelines, § 15382.) The focus of the inquiry is on "the physical conditions within the area affected by the project," which includes "land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance…." (Guidelines, § 15382.)

In determining whether there is a potential for such an adverse change in the environment, the "baseline" environmental conditions against which a project is to be compared are the physical conditions existing at the time the agency makes its CEQA determination and/or approves the project. (*Communities for a Better Environment*,

---

**35** One such case is *Berkeley Hillside Preservation v. City of Berkeley* (2012) 203 Cal.App.4th 656 (superseded by grant of review May 23, 2012, S201116), now pending before the California Supreme Court. The Supreme Court is likely to resolve the issue of the correct interpretation of Guidelines section 15300.2, subdivision (c), as well as the question of the appropriate standard of review for exceptions to categorical exemptions.

*supra*, 48 Cal.4th at pp. 321-322 ["the impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis"]; *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 558-559 (*East Shore Parks*) [same]; *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1453 ["environmental impacts should be examined in light of the environment as it exists when a project is approved"].)

Where a project involves ongoing operations or a continuation of past activity, the established levels of a particular use and the physical impacts thereof are considered to be part of the existing environmental baseline. (*Communities for a Better Environment*, *supra*, 48 Cal.4th at pp. 320-323, 326-328 [refinery's existing NOx emission levels constituted baseline for measuring adverse changes to environment of proposed diesel project]; *East Shore Parks*, *supra*, 202 Cal.App.4th at pp. 558-562 [baseline properly included current physical conditions and uses of operating marine terminal]; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 658 [established levels of mining operation part of baseline]; *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1196 [noting "the physical impacts of established levels of a particular use have been considered part of the existing environmental baseline"; thus, the agency needed only to analyze proposed increases in intensity or rate of use]; *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1274, 1278 [impact of existing airport operations were part of baseline]; *Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238, 242 [baseline included established traffic levels from ongoing mining operations].)

This baseline principle means that a proposal to continue existing operations without change would generally have no cognizable impact under CEQA. (*East Shore Parks*, *supra*, 202 Cal.App.4th at pp. 565-566 [since baseline included current operations of marine terminal, ongoing water discharges were part of that existing baseline, not an effect of the lease renewal under consideration]; *Bloom v. McGurk* (1994) 26 Cal.App.4th

1307, 1311-1312, 1315 (*Bloom*) [renewal of medical waste treatment facility's permit with no significant change in operations was exempt as the continued operation of an existing facility].)[36]  In *Bloom*, for example, where the Court of Appeal held that an "'existing facility'" under the class 1 categorical exemption was "a facility as it exists at the time of the agency's determination, rather than a facility as it existed at the time CEQA was enacted," the court emphasized that such conclusion was consistent with the rule that potential impacts are to be examined in light of the environment as it exists when a project is approved.  (*Bloom*, *supra*, at p. 1315 & fn. 3.)[37]  Since there was no change from the baseline usage and no unusual circumstances were present with respect to the medical waste facility in that case, the existing facilities exemption was upheld.  (*Id*. at pp. 1314-1317.)

Applying these CEQA baseline principles, we conclude that petitioners failed to establish the "significant effect on the environment" portion of the exception set forth in Guidelines section 15300.2, subdivision (c).  Even under the fair argument standard, the 2012 interim renewal contracts and the activity contemplated therein were not shown to have the potential to cause a *substantial adverse change* from the environmental baseline

---

**36**     The baseline is not the nonrenewal of the contracts.  An inquiry as to what happens if the contracts are not renewed would be a "'no project'" analysis, which CEQA expressly provides is *not* the baseline.  (Guidelines, §§ 15125, subd. (a), 15126, subd. (e)(1).)

**37**     In approving the existing facilities exemption as to the medical waste treatment facility in that case, the Court of Appeal in *Bloom* noted further:  "We presume that thousands of permits are renewed each year for the ongoing operation of regulated facilities, and we discern no legislative or regulatory directive to make each such renewal an occasion to examine past CEQA compliance at every facility built in the last 24 years.  That result would contravene the applicable statutes of limitation and the ordinary meaning of the words used in the class 1 exemption."  (*Bloom*, *supra*, 26 Cal.App.4th at p. 1315, fn. omitted.)

at the time of Water Districts' approvals, which baseline included existing physical conditions and established levels of CVP water distribution and use.

Petitioners cited studies in the record that referred to the annual pumping and diversion of Delta water by the CVP (and the State Water Project) as one of many factors negatively affecting certain fish species such as the smelt and salmon. Petitioners also pointed to evidence in the record that the continued use of irrigation water on the west side of the San Joaquin Valley contributed to salt and selenium levels in the soil and/or groundwater of that area due to a lack of adequate drainage. Although the matters raised by petitioners are genuine concerns, the evidence was inadequate to show that the particular project under consideration (i.e., the 2012 interim renewal contracts) had a potential to bring about a substantial adverse change to the environment. This conclusion follows from two observations. *First*, the particular activities challenged by petitioners—i.e., the large volume of CVP water distributed to Water Districts and used for irrigation purposes on lands within Water Districts' boundaries—were clearly part of the existing environmental baseline for Water Districts' ongoing operations. Therefore, proof of a potential for adverse change in the environment from the conditions under the existing baseline is lacking. *Second*, even assuming that the asserted impacts of Water Districts' operations were not entirely subsumed within the existing environmental baseline, the evidence in the record was still inadequate to show that *the brief period* involved in the 2012 interim renewal contracts (i.e., a mere two years) would potentially have a significant effect. For these reasons, we conclude that the exception in Guidelines section 15300.2, subdivision (c), to categorical exemptions is not supported by the record in this case.

### B. *No Cumulative Impact of Successive Projects*

The Guidelines also provide a cumulative impact exception to categorical exemptions, stating: "All exemptions for these classes are inapplicable when the cumulative impact of successive projects of the same type in the same place, over time is

significant." (Guidelines, § 15300.2, subd. (b).) "[T]he purpose of the requirement that cumulative impacts be considered … is to ensure review of the effects of the project in context with *other* projects of the same type." (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 703, italics added.) "Cumulative impact analysis is necessary because the full environmental impact of a proposed project cannot be gauged in a vacuum." (*Communities for a Better Environment v. California Resources Agency*, *supra*, 103 Cal.App.4th at p. 114, fn. omitted.)

A "cumulative impact from several projects" is defined in the Guidelines as "the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (Guidelines, § 15355, subd. (b); see § 21083, subd. (b)(2).) "'[A] cumulative impact of a project is an impact to which that project contributes and to which other projects contribute as well. [¶] The project must make some contribution to the impact; otherwise it cannot be characterized as a cumulative impact of that project.'" (*Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 700, italics added, quoting 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2003) § 13.36, p. 533.)

On this front, petitioners argue that the 2012 two-year, interim renewal contracts, when taken together with other such contracts (past and future) for the delivery of CVP water between the Bureau and Water Districts (and others), have a significant cumulative impact on the environment. According to petitioners, the successive contract renewals have created, incrementally and cumulatively, significant environmental harm over time, including salt and selenium buildup in the soil and groundwater, as well as harm to salmon, smelt and other endangered fish populations and their habitat in the Delta.

51.

Water Districts' response is that we should not treat a renewal of the continuing operation of existing facilities (where no change in established levels of use will occur) as though it were an entirely new project with new impacts for purposes of CEQA review, because to do so would arguably circumvent CEQA's baseline principles. In any event, even assuming that each new round of interim renewal contracts resulted in "successive projects" within the meaning of Guidelines section 15300.2, subdivision (b), Water Districts argue that there was no cumulative impact here. (See, e.g., *East Shore Parks*, *supra*, 202 Cal.App.4th at pp. 565-566 [applying baseline principles to cumulative impact analysis].) That is, viewed in their correct setting, each interim renewal merely continued forward the existing parameters for the delivery of water under the existing environmental baseline conditions, which baseline conditions included the impact of established levels of annual water use. Therefore, according to Water Districts, no new or added impacts were created by each successive interim renewal. (See *id*. at pp. 558-562, 566 [lease renewal of an operative marine terminal had no cumulative impact, since the effects were part of baseline of the existing marine terminal and not of the lease renewal].)

Water Districts are correct that if each interim renewal is measured against the existing baseline at the time of its approval, then in each instance there would be no significant effect on the environment. (See discussion above relating to the significant effect exception set forth in Guidelines, § 15300.2, subd. (c).) Moreover, if we were to treat each interim renewal as having a zero impact for purposes of our cumulative impacts analysis, then the cumulative effect of adding each of them together would remain zero. As was stated in *Santa Monica*, *supra*, 101 Cal.App.4th at page 799: "Just as zero when added to any other sum results in no change to the final amount, so, too, when no environmental impacts cognizable under CEQA are added to the alleged environmental impacts of past projects, there is no cumulative increased impact." Under this approach, the current project (the 2012 interim renewal contracts), when considered

together with other such renewals (the successive projects), would have no cumulative impact. As noted by Water Districts, such an approach is consistent with the analysis used in *East Shore Parks*, *supra*, 202 Cal.App.4th at pages 565-566, where it was held that an environmental impact report did not need to discuss the cumulative impacts asserted by the petitioners in that case because the specified impacts were part of the existing baseline for the marine terminal's current operative conditions, and not impacts of the newly approved project (i.e., the renewal of the marine terminal lease).[38]

Petitioners' rebuttal is that we are not dealing with a situation where baseline conditions, continued over time, create a sort of equilibrium where a certain number of fish are killed each year but everything else remains roughly the same. Instead, according to petitioners, the condition of the environment is growing steadily worse, with the combined impact of successive renewals contributing to the further significant deterioration of an already bad situation. In support of such assertion, petitioners point to evidence that CVP pumping in the Delta in conjunction with that of the State Water Project contribute to factors that jeopardize or threaten the continued existence of the delta smelt and certain salmon species, the numbers of which are steadily declining; and also that the continued use of irrigation water in the area of Westlands Water District is causing groundwater and soil to be increasingly degraded over time to the point that agricultural land must be retired. The gist of what petitioners are saying is that sometimes the collective whole, over time, creates impacts far greater than the sum of the individual parts.

Whether or not petitioners' argument is sufficient to overcome the force of Water Districts' position that no cumulative harm exists because all incremental impacts were

---

[38] That same opinion also noted the fact that "baselines reflecting current conditions, including unauthorized and even environmentally harmful conditions," sometimes means that "those conditions … never receive environmental review." (*East Shore Parks*, *supra*, 202 Cal.App.4th at p. 561.)

subsumed by the existing baseline, we hold that the present litigation was not the proper time for petitioners to raise that cumulative-impact claim because, here, the short-term interim renewal contracts did not constitute "successive projects of the same type" (Guidelines, § 15300.2, subd. (b)). Both the original 1963 water service contract (which provided for renewable, long-term water service contracts of 40-year periods) and the CVPIA (which in CVPIA, § 3404(c)) provided for renewals of the existing, long-term water service contracts for additional periods of 25 years) clearly recognized that this water distribution plan was to be carried out over long periods of time by means of renewable, *long-term* water service contracts.[39] Looking to substance over form, then, the "successive projects of the same type" (Guidelines, § 15300.2, subd. (b)) are the *long-term* water service contracts that will, in due course, succeed each other. The parties are now in a temporary, interim period between the original, long-term water service contract and the anticipated, long-term renewal thereof, which interim was made necessary under the terms of the CVPIA solely as a brief, delaying action to give the Bureau more time to complete its environmental documentation. (CVPIA, § 3404(c).) Under the circumstances, we conclude that these short-term, interim renewal contracts did not amount to "successive projects of the same type" under Guidelines section 15300.2, subdivision (b).[40] Consequently, if petitioners wish to pursue their argument in favor of the cumulative impacts exception to the categorical exemption, we believe the proper

---

[39]     It may be that the water projects were understood to continue indefinitely, although we need not decide that matter. Here, we are merely focusing on the long-term nature of the contracts that allowed the operations to be carried out.

[40]     Conceptually, the short-term, interim renewals were not new or distinct "other" projects (Guidelines, § 15355, subd. (b)), but extensions of the original, preexisting project (i.e., the continuation on identical terms of the preceding contracts), which under the circumstances do not constitute "successive projects of the same type" (Guidelines, § 15300.2., subd. (b)).

54.

time to do that will be in connection with Water Districts' future consideration of whether to approve the anticipated, long-term renewal of the water service contract.

This result is also in accord with notions of basic fairness and reasonableness in how CEQA is applied. As summarized previously herein, the CVPIA directed the Bureau to renew existing, *long-term* water service contracts once certain environmental studies by the Bureau were done. But the CVPIA further provided that until such environmental studies were completed, only *interim* renewal contracts of a very short duration could be entered into. The interim renewals were to be three years on the first occasion, with successive, interim periods of up to two years in length thereafter until the Bureau completed the required environmental documentation. (CVPIA, § 3404(c).) Thus, the CVPIA imposed interim renewal periods *of artificially short durations* to provide the Bureau with brief continuances, during which time the status quo would be maintained to bridge the gap. Since the exceptional brevity of each interim renewal period was not project driven, but was merely an expedient mechanism imposed by the CVPIA to assist the Bureau, we believe it would be unreasonable to insist that Water Districts conduct a full-scale environmental review under CEQA on the occasion of each two-year interval.[41] Yet that would presumably be the outcome were we to treat each two-year, interim renewal as a distinct, successive project as petitioners would have us do and, assuming for the sake of argument, that petitioners are correct in their position on cumulative impact.[42] We decline to elevate form over substance or to interpret CEQA in

[41] The CVPIA was intended, in part, to "improve the operational flexibility" of the CVP. (CVPIA, § 3402(c).) That purpose would be greatly obstructed, and the continued efficient provision of CVP water under existing entitlements would be thrown into a state of biannual uncertainty, if state law environmental review under CEQA were required with every two-year, interim renewal.

[42] We realize there is still the ongoing projects exemption, but for purposes of our present analysis, we are considering the existing facilities exemption on its own.

a manner that would lead to such absurd or oppressive burdens. (See, e.g., *Sierra Club. v. West Side Irrigation Dist.*, *supra*, 128 Cal.App.4th at p. 703 ["'rules regulating the protection of the environment must not be subverted into an instrument [of] oppression and delay'"].)

Accordingly, under the unique statutory context of this case, we hold that the brief, two-year, interim renewals at issue herein were not distinct or successive projects for purposes of Guidelines section 15300.2, subdivision (b) and, therefore, that exception was not established. On the record before us, the existing facilities categorical exemption was applicable to the 2012 interim renewal contracts and that exemption was not barred by either of the exceptions raised by petitioners.

In light of the conclusions we have reached in this opinion regarding CEQA exemptions, it is unnecessary to address Water Districts' additional arguments (procedural and otherwise) offered in support of their position that CEQA did not apply.

## DISPOSITION

The judgment denying the petition for writ of mandate is affirmed. Costs on appeal are awarded to Water Districts.

_____
Kane, J.

WE CONCUR:


_____
Hill, P.J.


_____
Levy, J.

56.