Filed 12/28/22; Certified for Publication 1/26/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAVE LIVERMORE DOWNTOWN,<br>    Plaintiff and Appellant,<br>v.<br>CITY OF LIVERMORE et al.,<br>    Defendants and Respondents;<br><br>EDEN HOUSING, INC.,<br>    Respondent and Real Party<br>in Interest. | A164987<br><br>(Alameda County<br>Super. Ct. No. RG21102761) |

The City of Livermore (City) approved a 130-unit affordable housing project in the downtown area. A local organization calling itself Save Livermore Downtown (SLD) unsuccessfully challenged the project approval on the grounds the project is inconsistent with the planning and zoning law and that further review of the project's environmental impacts is necessary. Like the trial court, we reject these contentions. We further find no abuse of discretion in the trial court's order requiring SLD to post a bond. We affirm the judgment.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The City adopted a General Plan and a Downtown Specific Plan in 2004, for which it completed and certified an environmental impact report (EIR). A subsequent EIR (SEIR) was certified in 2009, after the City made amendments to the Downtown Specific Plan that, inter alia, increased the amount of development allowed.

In January 2018, the City approved a plan for redeveloping City-owned sites in the "Downtown Core" area. The plan included public park space, commercial retail buildings, cultural facilities, multifamily workforce housing, a public parking garage, and a hotel. In May 2018, the City selected Eden Housing, Inc. (Eden) as the developer for the multifamily housing component of the plan. An addendum to the 2009 SEIR was prepared in 2019. Two further addenda were prepared in 2020 when the project was modified.

The housing project Eden proposed (the project) would redevelop the northwestern quadrant of the Downtown Core with two four-story buildings (a north and a south building) containing a total of 130 affordable housing units. These are reserved for people with incomes of 20 to 60 percent of Alameda County's median income (i.e., low-, very low-, and extremely low-income households). Land between the two buildings would become a public park, and private open space reserved for residents would be adjacent to each building. Parking would be underground, with additional parking in a nearby parking garage. The project site is bounded by Railroad Avenue on the north, L Street on the west, and Veterans Way on the south. It was previously the site of a Lucky's grocery store, and before that a railroad depot. To the east is a further portion of the Downtown Core area, including

a theater, retail space, and a park, with Livermore Avenue to the east of those facilities.

The project site has a land use designation in the General Plan of "Downtown Area." Its designation in the Downtown Specific Plan is "Subarea 4—Special Condition Sub-District D." Uses allowed for the site's zoning include affordable multifamily housing.

In 2021, the City's Planning Commission voted to approve Eden's application to develop the affordable housing component of the Downtown Specific Plan. On May 25, 2021, the City approved the project's application for design review and a vesting tentative parcel map for the project, finding the project conformed with the General Plan and the Downtown Specific Plan's standards and guidelines, and that no substantial changes were proposed that would require major revisions to the previous EIR, SEIR, or addenda. The City found the project exempt from the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) on multiple grounds, including that it was consistent with a specific plan for which an EIR had been certified (Gov. Code, § 65457; 14 Cal. Code Regs., § 15182, subd. (c))[1] and that it was an infill development project (Guidelines, § 15332).

SLD brought a petition for writ of mandate challenging approval of the project on June 24, 2021. SLD alleged that the project violated state and local planning and zoning laws in that it was inconsistent with the Downtown Specific Plan's development and design standards, that the project

---

[1] The CEQA Guidelines are found at sections 15000 to 15387 of title 14 of the California Code of Regulations. We afford them great weight, unless clearly unauthorized or erroneous under CEQA. (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 381.) We shall refer to them as the Guidelines.

3

was not exempt from CEQA, and that the City violated CEQA by failing to conduct further environmental review.

Eden moved for a bond under Code of Civil Procedure section 529.2, which under certain conditions authorizes a bond of not more than $500,000 in an action brought to challenge qualified low- or moderate-income housing projects. The trial court granted the motion and required SLD to file an undertaking of $500,000 as security for costs and damages Eden would incur as a result of litigation-related project delays, finding as it did so that the action was brought for the purpose of delaying the provision of affordable housing and that the undertaking would not cause SLD undue economic harm. SLD filed a petition for writ of mandate in this court seeking relief from the undertaking requirement, and a different panel of this division denied the petition. (*Save Livermore Downtown v. Superior Court* (Oct. 7, 2021, A63603) [pet. den.].)

On the merits, the trial court denied SLD's petition, stating as it did so that "[t]his is not a close case," that "[t]he CEQA arguments are almost utterly without merit," and that substantial evidence supported the City's conclusion that the project was consistent with the specific plan. This timely appeal ensued. The City and Eden then brought a motion in this court to expedite the appeal or dismiss it as frivolous. We granted a slightly accelerated schedule, declining to dismiss the appeal.

## DISCUSSION

### I. Consistency with Downtown Specific Plan

SLD contends the project was unlawfully approved because the project design is inconsistent with the Downtown Specific Plan in multiple respects: the lobby does not face a primary street and there is parking between the buildings and the street; the four-story portions of the buildings take up too

4

much of the site's frontage; the external appearance of the units lacks "individuality"; some of the windows are not " 'vertically proportioned' "; and open space requirements are not satisfied.

A development project must be consistent with the applicable general plan. (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 508; *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510 (*Sierra Club*).) This principle requires the project to be consistent with the Downtown Specific Plan, prepared to implement the General Plan. (See *Sierra Club*, at p. 1509; Gov. Code, §§ 65450, 66473.5.) The goal of consistency is accomplished, " ' "if, considering all its aspects, [the project] will further the objectives and policies of the general plan and not obstruct their attainment." ' [Citation.] A given project need not be in perfect conformity with each and every general plan policy." (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336 (*Families Unafraid*); accord, *Sierra Club*, at p. 1511.) It is enough that the project is compatible with the plan's objectives, policies, general land uses, and programs. (*Bankers Hill 150 v. City of San Diego* (2022) 74 Cal.App.5th 755, 776 (*Bankers Hill 150*).)

"[I]t is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions." (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719 (*Sequoyah Hills*).) We decide merely whether city officials "considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial

evidence." (*Id*. at pp. 719–720.) We "defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion." (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 155.)

A second factor is relevant because this project will provide affordable housing. Under the Housing Accountability Act (Gov. Code, § 65589.5) (HAA), a local agency may not disapprove a housing development project for very low-, low-, or moderate-income households, nor condition approval in a manner that renders the project infeasible, unless it makes one of several specific findings, among them that the project would have a specific, adverse impact on public health and safety or that the project is inconsistent with both the zoning ordinance and land use designation at the time the application was deemed complete. (Gov. Code, § 65589.5, subd. (d)(2) & (5).) And for any housing development, without regard to income-level, a local agency may not disapprove a project that complies with "applicable, *objective* . . . standards and criteria, including design review standards," in effect when the application was deemed complete, unless the project would have a specific, adverse impact on public health or safety that cannot feasibly be mitigated or avoided. (Gov. Code, § 65589.5, subd. (j)(1), italics added.) An objective standard is one that can be applied without "personal interpretation or subjective judgment." (*California Renters Legal Advocacy & Education Fund v. City of San Mateo* (2021) 68 Cal.App.5th 820, 840 (*California Renters*).)

In reviewing challenges to approval of a project, we review the City's actions rather than the trial court's decision. (*California Renters*, at p. 837.) As a general matter, we determine "whether the City prejudicially abused its discretion in approving the [p]roject by not proceeding in a manner required

6

by law, by reaching a decision not supported by its findings, or by making findings not supported by the evidence." (*Bankers Hill 150*, *supra*, 74 Cal.App.5th at p. 768.)

When a project is subject to the HAA, however, a different standard may apply: *California Renters*, in reviewing a decision *denying* an application to build new housing, explained that instead of asking, "as is common in administrative mandamus actions, 'whether the City's findings are supported by substantial evidence' [citation], we inquire whether there is 'substantial evidence that would allow a reasonable person to conclude that the housing development project' complies with pertinent standards." (*California Renters*, *supra*, 68 Cal.App.5th at p. 837; Gov. Code, § 65589.5, subd. (f)(4).) But the court in *Bankers Hill* recognized that this "stringent, independent review" may be unnecessary where, as here, the agency *approves* a project. (*Bankers Hill 150*, *supra*, 74 Cal.App.5th at p. 777.) In fact, there seems to be no practical difference in the two standards when an agency finds a project consistent with its general plan, as even under the ordinary standard that finding " 'can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion.' " (*The Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, 896 [applying deferential standard to consistency determination not involving the HAA].) Using either lens to review the project's consistency with the specific plan—asking whether there is substantial evidence from which a reasonable person could find the project consistent, or whether there is substantial evidence supporting the City's finding of consistency—leads to the same conclusion.

SLD fails to show the project is inconsistent with the "objectives, policies, general land uses and programs" of the Downtown Specific Plan

under these standards. (*Families Unafraid*, *supra*, 62 Cal.App.4th at p. 1336.) In finding the project consistent with the plan, the City explained that the plan's policies include allowing housing of a range of types and densities and focusing on redevelopment of "catalyst" sites like the former Lucky's parcel, and that the purpose of the plan was to revitalize the City's historic core as the pedestrian-oriented center of the City. The project would further this policy by developing affordable residential units and pedestrian connections to First Street. The City also found the project conformed with applicable development standards for setbacks, height, and open space: it would dedicate approximately 0.7 acres for a public park; and it included façades with horizontal plane changes at regular intervals, vertical modules, articulated and detailed building corners, minimal streetside setbacks to reinforce continuous public streets and pathway space, and distinctive architectural details that complemented other traditional building styles nearby.

SLD makes no effort to show the project would not promote the overarching policies of providing housing, including affordable housing, and revitalizing the Downtown area. Rather, its challenges are limited to asserted inconsistencies between details of the project and standards in the Downtown Specific Plan. We reject each of SLD's specific complaints in turn.

***Main Entrance/Siting and Orientation.*** The Downtown Specific Plan addresses "Main Entrance[s]," including an objective that "[e]ntrances shall convey a clear residential character, one that is welcoming to the building's tenants." The standards meant to further this objective recite that "[p]rimary entrances to multi-unit buildings shall front onto the primary street." A related "Siting and Orientation" objective states that "[b]uildings shall be sited to reinforce the public street network of Downtown, aligning

8

with primary street frontages and public pathway spaces." Under this topic, the standards provide that "[t]he backs of buildings shall not face public streets," and that "[p]arking is not permitted between the public street and adjacent residential buildings."

SLD argues the project violates these standards because a lobby will be located on the park side of the north building and will not face a primary street and thus, the back of the building will face Railroad Avenue. The standards refer not to the location of lobbies, but to the location of entrances and the backs of buildings. The record shows a pedestrian entrance on the Railroad Avenue side of the building, as well as an accessible walkway leading to the same entrance, and a drawing of the exterior depicts that entrance as prominent. The area immediately by the entrance, described on site drawings as a lobby, appears to be connected to a larger lobby area on the park side of the building. This evidence is more than adequate to support the City's conclusion—indeed, any reasonable person's conclusion—that the project complies with the objective for main entrances. (See *California Renters*, *supra*, 68 Cal.App.5th at p. 837; *Bankers Hill 150*, *supra*, 74 Cal.App.5th at p. 777.)

We are no more persuaded by SLD's argument that the project violates the prohibition on parking between the public street and residential buildings. SLD points out that the project drawings show street parking on Veterans Way, just south of the south building. But the City asserts, and SLD does not dispute, that the parking is *existing* parking on the *public street*. Parking for residents of the project will be under the buildings, not visible from outside. We see nothing to compel a finding that existing street parking renders the project inconsistent either with the objective that buildings "be sited to reinforce the public street network of Downtown," or

9

with the supporting design standard prohibiting parking "*between* the public street and adjacent residential buildings." (Italics added.)

*Site Frontage.* The Downtown Specific Plan provides that residential development on the "Catalyst Project Site" located south of Railroad Avenue between L Street and South Livermore Avenue (the former Lucky's site) may be four stories tall, "provided the fourth floor does not extend for more than 60% of the site frontage along L Street, Railroad Avenue, and South Livermore Avenue."

SLD contends the project violates this rule because the fourth floor of the residential buildings extends along more than 60 percent of the frontage *of the portions* of the Catalyst Project Site the project occupies along Railroad Avenue and L Street, and the project does not run along South Livermore Avenue. SLD simply ignores the applicable language in the plan: the 60 percent limitation applies not to the *residential* portion of the Catalyst Project Site, but to the entire perimeter along L Street, Railroad Avenue, and South Livermore Avenue. SLD makes no effort to show—and the site drawings refute—that the four-story residential buildings front on more than 60 percent of this perimeter. SLD thus shows no inconsistency with the specific plan.

*Massing*. The Downtown Specific Plan provides, "[t]he massing of larger residential buildings shall be broken down to convey a sense of 'home', and give individuality to each unit that lies within it." To accomplish this objective, "[m]ultifamily buildings shall avoid a monotonous or overscaled massing, i.e., a 'project' appearance," and "[b]uilding massing shall be subdivided into portions or segments compatible with the adjacent residential scale." The plan also provides that "[h]orizontal mass shall be broken down to create architectural interest and provide visual separation between units

10

or modules of units." Here, supporting standards require that "[f]acades of long buildings shall be architecturally subdivided into shorter segments every twenty-five (25) to fifty (50) feet maximum," and that vertical modules of units incorporate features to distinguish them, "such as wall breaks, projections, distinct color schemes, and individual roof treatments."

SLD contends the project violates these standards because the units or groups of units have no "individuality," for example with separate roof forms, balconies, or porches making them distinguishable from each other. Instead, SLD describes the project as "two massive walls of uniform development."

We note that in the main, these standards are subjective: questions of whether the building's façades are sufficiently "broken down to convey a sense of 'home'" and individuality, or "create architectural interest and . . . visual separation" inherently require personal interpretation and subjective judgment. As a result, we doubt that under the HAA these standards may be used to deny approval of the project. (*California Renters*, *supra*, 68 Cal.App.5th at pp. 839–840; *Bankers Hill 150*, *supra*, 74 Cal.App.5th at pp. 777-778.)

In any event, substantial evidence in the record supports the finding that the project conforms to the applicable standards because it includes varied massing, façades with horizontal plane changes at regular intervals, vertical modules, articulated and detailed building corners, and other architectural features. SLD draws our attention to drawings of the proposed buildings that, in our view, support rather than undermine these conclusions. Certainly nothing in them compels a finding that the buildings have a "monotonous," "overscaled," or " 'project' " appearance in violation of the massing standards or that there is no differentiation among clusters of units.

11

***Windows***.  The Downtown Specific Plan provides that windows within a building and across a façade be related in design, operating type, proportions, or trim, and "shall be used as architectural elements that add relief to the façade and wall surface."  Among the relevant standards, "[b]uildings *shall include* vertically proportioned façade openings, with windows that have a greater height than width (an appropriate vertical/horizontal ratio ranges from 1.5:1 to 2:1).  Where glazed horizontal openings are used, they shall be divided with multiple groups of vertical windows."  (Italics added).

To argue that the project conflicts with these standards, SLD contends that some of the windows are wider horizontally than vertically.  That may be true, but it is irrelevant.  Our review of the drawings of the project confirms that most of the windows are oriented vertically—and, as a result, that the buildings "include" vertically proportioned windows—amply supporting a finding that the project is in conformity with this standard.

***Open Space.***  The Downtown Specific Plan provides that residential uses must provide "publicly accessible common outdoor space for the development, as well as private open space (e.g. balconies or patios accessible only to the dwelling/dwellings served)."  Specifically, for residential and mixed-use developments, the specific plan requires 150 square feet of publicly accessible open space and 60 square feet of private open space per residential unit.

To meet the private open space requirement, the project includes—inset into the south building—recreational and play facilities with a low perimeter fence, a communal seating area with trellis overhang and benches, and an area designated private open space and "south park frontage."  For the north building, an open courtyard is inset and an open area is designated

12

"north park frontage."  According to a staff report, these areas would be for the exclusive use of residents.

SLD contends the project does not live up to the private open space requirement because these areas do not appear to have physical barriers to prevent the general public from using them.  But SLD does not show that the Downtown Specific Plan requires physical barriers or that a layout in which private open space is inset into residential buildings cannot satisfy the private open space requirement.  We bear in mind that it is not our province to "micromanage" development decisions (*Sequoyah Hills*, *supra*, 23 Cal.App.4th at p. 719); it is enough that a project is *compatible* with the plan's objectives, policies, general land uses, and programs (*Bankers Hill 150*, *supra*, 74 Cal.App.5th at p. 776).  In our view, the record supports a conclusion that these open space areas are sufficiently separate from the public park to qualify as private open space as required by the Downtown Specific Plan.

As to the public open space requirement, a sizable area between the north and south buildings and east of the south building will be dedicated as the future Veteran's Park.  SLD surmises that the City, rather than Eden, will be paying for the public park, as the City has put out a request for proposals for landscape design services to develop the park.  As a result, SLD contends, Eden has not fulfilled its obligation to provide 150 square feet of public open space per unit.  This contention is meritless.  SLD points to nothing in the Downtown Specific Plan specifying who must fund the public open space.  Evidence that land between and adjacent to the residential buildings—already City-owned, as is the rest of the site—will be dedicated for a public park fully supports a finding that the public open-space requirement is satisfied.

13

***Conclusory Findings.*** In addition to challenging the evidentiary basis for the City's consistency findings, SLD also contends the findings are so conclusory that they fail to "bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515.) While findings must be sufficient to meet this standard, they "do not need to be extensive or detailed. ' "[W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].' " ' [Citation.] On the other hand, mere conclusory findings without reference to the record are inadequate." (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 517–518.)

Although the findings are relatively brief, we have had no difficulty discerning the basis of the City's conclusions. The City found that the project will promote the goals of providing housing and revitalizing the City's core area, and it went on to find that the project conforms to applicable development standards related to setbacks, height, and open space, and to the design standards in the Downtown Specific Plan, with reference to architectural details supporting its finding. Although the findings did not specifically discuss each of the project details SLD contends were inconsistent with the specific plan, SLD has not shown they were inadequate.

Moreover, the HAA has changed the legal landscape for considering SLD's challenges to the consistency findings. The HAA deems a housing project consistent with a plan's policy, standard, or requirement "if there is

14

substantial evidence that would allow a reasonable person to conclude" it is consistent. (Gov. Code, § 65589.5, subd. (f)(4).) The City recited, when making its findings, that it was acting based on its own independent review, in accordance with the HAA. We have considered SLD's challenges and are satisfied as to each of them that a reasonable person could conclude the requirements in question are satisfied. We thus reject SLD's contention that the consistency findings were inadequate.

## II.    Exemptions from CEQA

### A. Residential Project Consistent with Specific Plan

The City determined the project is exempt from CEQA under Government Code section 65457, which exempts from CEQA review residential development projects that are consistent with a specific plan for which an EIR has been certified. SLD contends this exemption does not apply and further environmental review is necessary because new information about soil and groundwater contamination arose after the 2009 SEIR was certified.

#### 1. Additional Factual Background

The 2009 SEIR for the amendments to the Downtown Specific Plan examined the environmental impacts of a proposed theater on three alternative sites, one of which encompassed the location of the proposed housing project now before us. Among the issues the SEIR considered was the possible presence of hazardous materials at the potential sites for the theater. The SEIR explained that soil and groundwater there had been affected by historic land uses such as railroad operations, service stations, dry cleaners, fuel storage, and machine shops. At the current project site, former railroad operations might have caused the presence of heavy metals, petroleum hydrocarbons, and pesticides in the soil and groundwater; dry

15

cleaning operations adjacent to the site might have led to the presence of chlorinated solvents in the groundwater; and hazardous materials might have been released by a petroleum company and an automobile company.

The 2009 SEIR included among potential environmental impacts that development of the theater at any of the alternative sites might expose construction workers and future site patrons, residents, or workers to hazardous concentrations of contaminants from soil and groundwater. It concluded that, before mitigation, this impact would be significant. As mitigation, the SEIR provided that before grading permits were issued, a soil management plan would be prepared; this plan would include any available environmental data from sampling at the specific site, a worker health and safety plan, requirements for soil management and off-site disposal, and a contingency plan for sampling and analysis of previously unknown hazardous materials. Further remediation might be required if evidence of contaminated groundwater was identified.

As to the current project site in particular, the 2009 SEIR explained that release of hazardous materials during demolition and earthwork activities could pose a hazard to construction workers, others nearby, and the environment; that future residents and patrons could be affected by hazardous materials if they came into contact with contaminated soil or groundwater; and that vapors from soil or groundwater could migrate into buildings constructed over sources of contamination. As mitigation, due to prior railroad and dry cleaner presence at or adjacent to the site, a licensed professional would prepare a soil and/or groundwater investigation work plan to evaluate potential hazardous materials, including sampling and analysis for heavy metals, petroleum hydrocarbons, pesticides, and chlorinated solvents and, if the results could affect public health or the environment,

16

regulatory agency oversight would be requested. The SEIR concluded these mitigation measures would reduce the impacts of the potential release of hazardous materials to a level of less than significant.

Three addenda updating the 2009 SEIR confirmed this analysis. The March 2019 addendum concluded the SEIR adequately evaluated impacts from hazardous materials and that, with implementation of the mitigation measures, "there would be no new impacts related to hazards and hazardous materials associated with the proposed project." Two further addenda prepared in August 2020 concluded there would be no new impacts, and no SEIR or further CEQA review was necessary.

In February 2021, the San Francisco Bay Regional Water Quality Control Board (Water Board) informed the City that soil, groundwater, and soil vapor sampling had been conducted at the project site. It reported that investigation conducted since 2009 had identified selected metals in soil, petroleum hydrocarbons in soil and groundwater, and volatile organic compounds, including tetrachloroethene (PCE, a dry-cleaning chemical) and its breakdown products, in groundwater and soil vapor; that soil containing metals would require management during site grading and use; and that additional action, focused on soil vapor and groundwater, was warranted to assess, remediate, and mitigate PCE and its breakdown products at the site. The Water Board asked the City to submit a data gap assessment workplan proposing soil, groundwater, and/or vapor sampling to collect necessary data, as well as an interim remedial action plan presenting the results of the investigation conducted under the workplan and describing the remedial alternatives evaluated and selected.

PANGEA Environmental Services, Inc., prepared the requested data gap assessment workplan in May 2021. It reported that PCE had been

17

detected in soil gas and groundwater, and that this impact merited further characterization and possible mitigation or remediation. It also reported that other metals, such as arsenic, lead and nickel, had been detected. It explained that PCE in soil gas could intrude into future structures, that this problem could be remediated by soil vapor extraction if necessary, and that engineering controls (such as ventilation in a parking structure) could safeguard occupants from residual vapor intrusion.

PANGEA also prepared a site assessment and summary report in 2020, which explained that engineering controls such as ventilated parking structures and chemical vapor barriers could safeguard future occupants from potential vapor intrusion, and that additional groundwater sampling and well monitoring was merited to monitor the stability of the PCE plume. PANGEA recommended a soil management plan to facilitate proper handling and disposal of metal-bearing soil during construction.

### 2. Analysis

With narrow exceptions, CEQA requires preparation of an EIR before a public agency approves or carries out a project that may have a significant effect on the environment. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511–512, 523; Pub. Resources Code, § 21151.) And, relevant to our analysis, CEQA permits " ' "the environmental analysis for long-term, multipart projects to be 'tiered,' so that the broad overall impacts analyzed in an EIR at the first-tier programmatic level need not be reassessed as each of the project's subsequent, narrower phases is approved." ' " (*Citizens' Committee to Complete the Refuge v. City of Newark* (2021) 74 Cal.App.5th 460, 468 (*Citizens' Committee*).)

Government Code section 65457 provides one of the exceptions to the requirement for CEQA review. That statute states that a residential

18

development project that is "undertaken to implement and is consistent with a specific plan for which an environmental impact report has been certified after January 1, 1980, is exempt from the requirements of [CEQA]." (*Id.*, subd. (a).) However, if "an event specified in Section 21166 of the Public Resources Code occurs" after the specific plan is adopted, the exemption does not apply unless an SEIR is prepared and certified. (Gov. Code, § 65457, subd. (a).)

Public Resources Code section 21166, in turn, provides that after an EIR has been prepared, no SEIR is required unless substantial changes to the project or its circumstances will require major revisions to the EIR, or "[n]ew information, which was not known and could not have been known at the time the [EIR] was certified as complete, becomes available." The Guidelines explain that the new information must be of "substantial importance," for example when the new information shows the project would have significant effects not discussed in the EIR or when significant effects will be substantially more severe then shown in the previous EIR. (Guidelines, § 15162(a)(3).) We review for substantial evidence the City's determinations that a statutory exemption from CEQA applies and that none of the circumstances under section 21166 exist. (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 850; *Citizens' Committee*, *supra*, 74 Cal.App.5th at p. 470.)

SLD contends the information from the Water Board and PANGEA about the presence of PCE's, metals, and other substances on the site constituted new information that takes the project outside the scope of this exemption. We disagree. The 2009 SEIR specifically considered the possibility that the soil and groundwater at the site might contain contaminants from historic railroad, automotive, and dry-cleaning uses at or

19

adjacent to the project site, and that those contaminants might include chemicals used in dry cleaning. Consistent with this possibility, the SEIR proposed mitigation measures, potentially to include regulatory agency oversight, and concluded that with those measures the impact would be less than significant. The City could reasonably conclude that the evidence the site was contaminated with dry-cleaning chemicals and other byproducts of the site's earlier uses—as contemplated in the 2009 SEIR—did not constitute new information that was not or could not have been known when the SEIR was certified.

SLD argues that the analysis in the 2009 SEIR was only cursory and thus inadequate to analyze the effects of the contamination now that it has been found. And, SLD points out, the 2009 SEIR analyzed impacts "at a programmatic level" rather than a project level because specific projects associated with amendments to the Downtown Specific Plan had not yet been finalized. We reject SLD's contentions. First, whether programmatic or project-specific, the SEIR considered the uses to which the project site had historically been put and the contaminants that might have resulted from those uses, and it took into account the effect of those contaminants on future occupants of buildings to be constructed there.

More fundamentally, SLD offers no support for its suggestion that Government Code section 65457's exemption does not apply when the previously certified EIR for the specific plan was a program-level EIR. As our colleagues in Division Four recently explained, while considering the exemption in the context of a program-level EIR, Government Code section 65457 "set[s] a higher threshold for review of a residential development consistent with a previously analyzed specific plan than for a project tiered under a program EIR. [Citation.] 'The [Government Code] section 65457

20

exemption, like other statutory exemptions, reflects the Legislature's determination that the interest promoted is "important enough to justify forgoing the benefits of environmental review." ' " (*Citizens' Committee*, *supra*, 74 Cal.App.5th at p. 476; accord, *Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1312.) While in some cases it may be necessary to prepare a project-level EIR as a later tier after a program EIR, "in others, the analysis will be completed by determining that the project is exempt from further CEQA analysis." (*Concerned Dublin Citizens*, at p. 1316.) The City properly made that determination here.

Because we uphold the City's finding that the project is exempt from CEQA review under Government Code section 65457, we need not consider whether the City properly found the project was *also* exempt as an infill project. Neither do we address whether, under *California Building Industry Assn. v. Bay Area Air Quality Management Dist.*, *supra*, 62 Cal.4th 369, the contamination of which SLD complains constitutes an environmental impact for purposes of CEQA.

## III.   Bond under Code of Civil Procedure Section 529.2

When a litigant brings an action challenging a qualified low- or moderate-income housing development project, the party defending the project may move under section 529.2 of the Code of Civil Procedure for an order requiring the plaintiff/petitioner to furnish an undertaking as security for costs and damages that may be incurred as a result of delay in carrying out the project. (Code Civ. Proc., § 529.2, subd. (a).) The grounds for such a motion are that "(1) the action was brought in bad faith, vexatiously, for the purpose of delay, or to thwart the low- or moderate-income nature of the housing development project, and (2) the plaintiff will not suffer undue economic hardship by filing the undertaking." (*Ibid*.) If the court determines

these grounds have been established and grants the motion, the resulting bond may not exceed $500,000.  (*Id.*, subd. (b).)

The parties agree that the decision whether to grant the bond is properly reviewed for abuse of discretion, although SLD points out that, to the extent it claims an error in statutory interpretation, we interpret the statute de novo.  (See *ABBA Rubber Co. v. Seaquest* (1991) 235 Cal.App.3d 1, 14, 17 [Code Civ. Proc., § 529 undertaking in connection with preliminary injunction]; *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1560–1561 [preliminary injunction].)  We disturb the trial court's exercise of its discretion only if it " ' " 'exceeded the bounds of reason or contravened the uncontradicted evidence.' " ' "  (*ABBA Rubber Co.*, at p. 17.)

In its motion for a bond under section 529.2 of the Code of Civil Procedure, Eden argued that this action had the effect of delaying the project and threatened its viability by putting at risk the tax credits that would assist in financing the project.  According to Eden, SLD "kn[ew] full well the consequences" of bringing this action, as its members had a history of opposing projects in the City and its counsel was a sophisticated law firm experienced in land use litigation.

As evidence that the action was brought for the *purpose* of delay and to thwart affordable housing, Eden pointed to an allegation in the petition that the City and Eden originally promised housing for those with incomes of up to 120 percent of area median income, but that as now proposed the project would house those with incomes of 20 to 60 percent of area median income, a level that would exclude teachers and firefighters; Eden suggested SLD opposed the project for being *too* affordable.  Eden also pointed out that SLD alleged it had developed an alternative plan that would allow the project site

22

to become a park and would place additional affordable housing across the street, north of Railroad Avenue. But, Eden contended, this "alternative" was a ruse, in that the City did not own the site, neither the City nor Eden controlled it, the site was not for sale, it had not been evaluated for affordable housing, it had no housing entitlement, there was no evidence the necessary financing would be available, and at best it would take "many, many years" to develop affordable housing there. And, Eden argued, SLD's proposal that a public park be placed on the project site belied any genuine concern that the soil was dangerous to human health. Eden also argued that all of SLD's claims were meritless, further demonstrating the action was brought for the purpose of delay. Finally, as evidence of an intention to delay, Eden provided evidence that SLD elected to prepare the administrative record but, almost 60 days after filing its petition for writ of mandate, it had made only minimal progress in doing so.

As to whether SLD would suffer undue economic hardship, Eden argued the organization was comprised of various wealthy people who could afford to file the undertaking; two of them regularly donated significant sums to other organizations opposing development in Livermore; SLD was "reported to have spent" more than $2,000,000 opposing the project; and SLD had hired and was paying "one of the largest and most expensive law firms in the country."

In opposition to Eden's motion for a bond, SLD submitted evidence that it was a nonprofit, unincorporated association formed in early 2021 and that it had spent approximately $37,000 on architectural services related to the alternative it suggested be built across Railroad Avenue. This amounted to "much of its funding," according to a supporting declaration, which also denied SLD had spent $2,000,000 opposing the project and asserted a

23

$500,000 bond would impose financial hardship and limit its ability to carry out its nonprofit activities and continue to prosecute this action. Another supporting declaration stated that SLD's finances were separate from those of its members, that SLD had received financial contributions from more than 50 people, that the purpose of the organization was to advocate for open space and against sprawl, that it supported affordable housing and did not file the action due to the project's low-income nature or for purposes of delay, and that a $500,000 bond would damage the organization and prejudice its ability to act in the public interest by challenging the City's incorrect legal decisions. SLD's counsel submitted a declaration averring that when a petitioner in a CEQA action elects to prepare the administrative record, commonly the agency compiles the relevant documents and sends them to the petitioner for review, organizing, and indexing, and that it was common to seek extensions of time to complete and certify the record.

SLD argued Eden failed to meet its burden to prove the undertaking would not cause undue economic hardship. It also objected to much of the evidence Eden presented to support its motion, including newspaper articles discussing the opposition to the project and the amount of money SLD and its members had allegedly spent, on-line estimates of the value of real property allegedly owned by SLD's members, and an estimate of the annual revenue of a business alleged to be partially owned by one of SLD's members.

In granting Eden's motion for a bond, the trial court found that the evidence did not show the action was brought in bad faith, vexatiously, or to thwart the low- or moderate-income nature of the housing project. However, it found, the action had the effect of delaying the provision of affordable housing and the preponderance of the evidence showed the action was brought for the purpose of delay. In so concluding, the court noted that the

petition was filed "at the very last moment[] permitted by the short statute of limitations," and that SLD allowed two months to elapse before starting to prepare the administrative record, did so only when prompted by the City, and then sought a 60-day extension of time, causing the hearing on the merits to be delayed. The court also found the undertaking would not cause SLD undue economic harm, in that it had at least 50 people contributing money to it, and that SLD's evidence that it would suffer harm was conclusory. The court therefore ordered SLD to file an undertaking of the statutory maximum, $500,000. Before making its ruling, the court sustained SLD's objections to newspaper articles discussing the opposition to the project and evidence of the personal wealth of SLD's members.

SLD argues this ruling was an abuse of the trial court's discretion. Without the evidence the trial court excluded, SLD contends, there was no evidence to support Eden's argument that SLD would not suffer undue economic hardship if required to post a bond. We disagree. The record before the court showed not only that more than 50 people had contributed to SLD, but also that the organization had spent some $37,000 commissioning plans for an alternative and unrealistic location for affordable housing. And, although the court did not mention this in making its ruling, SLD was represented by a prominent private law firm, further suggesting it could bear the cost of posting a bond without undue hardship.

SLD argues the burden of producing evidence of its financial status was not SLD's, but even if this is true [2] the fact remains that SLD *did* provide the number of its contributors and the amount it had spent on the alternative

_____

[2] Although respondents point out that information regarding SLD's assets and ability to support a bond is uniquely within SLD's possession, they do not take the position that SLD had any burden to produce evidence of its financial position, and we do not consider the issue.

25

proposal. The trial court was not required to ignore the evidence before it. Indeed, at the hearing on the motion, counsel for SLD conceded that the trial court could consider all of the evidence. While the evidence that SLD would not suffer undue financial hardship is not particularly strong, neither was the contrary evidence, and the court's ruling was not beyond the bounds of reason.

We are no more persuaded by SLD's argument that the trial court abused its discretion in concluding the action was brought for the purpose of delay. SLD contends the court should not draw an adverse inference from the fact that it filed its petition at the end of the 30-day limitations period. (Gov. Code, § 65457, subd. (b).) And, according to SLD, the evidence shows the delay in preparing the administrative record was routine writ practice. But the trial court could reasonably see the evidence that SLD did not seek to advance preparation of the record for almost two months after filing this action as an indication that it was not prosecuting the action diligently. (See *Venice Canals Resident Home Owners Assn. v. Superior Court* (1977) 72 Cal.App.3d 675, 681 ["unfair delay" occurred where plaintiffs did not request administrative record until 55th day of the 60 days allowed].) We also note that one of the bases for Eden's argument that the action was brought for purpose of delay was that SLD's substantive arguments lack objective merit. After reviewing this appeal thoroughly, we can only agree. With the trial court we conclude, "[t]his is not a close case." SLD's contentions regarding the project's consistency with the Downtown Specific Plan and its CEQA arguments lack merit, so much so that the inherent weakness of these claims further supports the trial court's finding that SLD brought this action to delay the project.

We see no abuse of discretion in the trial court's ruling.

26

## DISPOSITION

The judgment is affirmed.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*Save Livermore Downtown v. City of Livermore et al.* (A164987)

27

Filed 1/26/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAVE LIVERMORE DOWNTOWN,<br>     Plaintiff and Appellant,<br>v.<br>CITY OF LIVERMORE et al.,<br>     Defendants and Respondents;<br><br><br>EDEN HOUSING, INC.,<br>     Respondent and Real Party<br>in Interest. | A164987<br><br>(Alameda County<br>Super. Ct. No. RG21102761) |

**THE COURT\*:**

Appellant has filed a petition for rehearing of this court's December 28, 2022 opinion, and multiple requests for publication have also been filed.

Appellant's January 12, 2023 petition for rehearing is DENIED.

The requests for publication are GRANTED. The written opinion which was filed on December 28, 2022 has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and is ordered to be published in the official reports.

Dated:__1/26/23_____ _____TUCHER, P.J.____ P.J.

---

\* Tucher, P.J., Fujisaki, J., and Petrou, J. participated in the decision.

1

Trial Court:      Alameda County Superior Court

Trial Judge:     Hon. Frank Roesch

Counsel:         Latham & Watkins, Winston P. Stromberg, Michelle
                 Cornell-Davis, and  Kevin A. Homrighausen for Plaintiff
                 and Appellant

                 Jason R. Alcala, City of Livermore Attorney, and Kimberly
                 Cilley, Staff Attorney; Burke, Williams & Sorensen,
                 Stephen E. Velyvis, Eric S. Phillips, and Nicholas J.
                 Muscolino for Defendants and Respondents

                 Rob Bonta, Attorney General of California, Daniel A.
                 Olivas, Senior Assistant Attorney General, Christina
                 Bull Arndt, Supervising Deputy Attorney General,
                 Andrew R. Contreiras, Deputy Attorney General for the
                 Attorney General of California as Amicus Curiae on
                 behalf of Defendants and Respondents

                 Goldfarb & Lipman, James T. Diamond, Jr., Barbara
                 Kautz, and Nazanin Salehi for the League of California
                 Cities as Amicus Curiae on behalf of Defendants and
                 Respondents

                 Cox, Castle & Nicholson, Andrew B. Sabey, Scott B. Birkey,
                 and Robbie C. Hull for Respondent and Real Party in
                 Interest

*Save Livermore Downtown v. City of Livermore et al.* (A164987)

2